Richard TOWNES, Jr., Petitioner–Appellant,

v.

Edward W. MURRAY, Director, Respondent–Appellee.

No. 93–4008.

United States Court of Appeals, Fourth Circuit.

Argued March 9, 1994.

Decided Oct. 26, 1995.

**ARGUED:** David Peter Wadyka, Hannoch Weisman, P.C., Roseland, New Jersey, for Appellant. Robert Quentin Harris, Assistant Attorney General, Office Of The Attorney

General, Richmond, Virginia, for Appellee. **ON BRIEF:** William W. Robertson, Marshall D. Bilder, Hannoch Weisman, P.C., Roseland, New Jersey; Andrew R. Sebok, Norfolk, Virginia, for Appellant. Stephen D. Rosenthal, Attorney General of Virginia, Office Of The Attorney General, Richmond, Virginia, for Appellee.

Before NIEMEYER and LUTTIG, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge NIEMEYER joined. Judge LUTTIG wrote an opinion concurring in part and concurring in the judgment.

## OPINION

PHILLIPS, Senior Circuit Judge:

In this habeas proceeding, Richard Townes, Jr. makes several constitutional attacks on his conviction and death sentence for the murder of Virginia Goebel in 1985. His primary claims are that the trial court erred by not conducting an inquiry, pursuant to *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), to determine his competence to represent himself during the sentencing phase of his trial, and, that in light of the Supreme Court's recent decision in *Simmons v. South Carolina,* 512 U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), his sentencing was constitutionally infirm. He also challenges several procedural rulings of the district court leading to that court's dismissal of his habeas petition. We find no error in that dismissal and affirm.

### I

The facts surrounding Virginia Goebel's murder, and Richard Townes's arrest and prosecution for it, are recounted in detail in the published decision of the Supreme Court of Virginia, *Townes v. Commonwealth,* 234 Va. 307, 362 S.E.2d 650 (1987), *cert. denied, Townes v. Virginia,* 485 U.S. 971, 108 S.Ct. 1249, 99 L.Ed.2d 447 (1988). To put Townes's claims in context, a brief synopsis of the facts and procedural history is needed.

Sometime during the early morning hours of April 14, 1985, Virginia Goebel, a night shift cashier at a Virginia Beach convenience store, was murdered. The last person other than her murderer to see Goebel alive was Dorothy Moore, a regular customer who on that morning entered the store around 2:00 a.m. As she walked to the rear of the store Moore noticed a man standing "in the back corner ... just watching." After Goebel reassured her that everything was okay, Moore made her purchase and exited. As she drove away, she noticed that the man watched her departure.

Just before 5:00 a.m. Goebel's body, felled by a .45 caliber bullet, was discovered face down behind the counter in a pool of blood. The exact time of death could not be determined.

Evidence implicating Townes came primarily from three sources. First, a state firearms expert determined that an empty shell casing found next to the victim's body matched empty casings from a gun traceable to Townes. Second, customer Moore, although delaying a month before contacting police, did positively identify Townes via photos and a line-up as the man she had seen in the convenience store on the night of Goebel's murder. Finally, inculpating evidence came from Townes's cellmate at the Virginia Beach jail. According to the fellow prisoner, Townes admitted murdering Goebel.

Townes was indicted and tried by the Commonwealth of Virginia for capital murder, as well as robbery and use of a firearm while committing robbery. He was initially represented by the Office of the Public Defender. When the public defender withdrew from the case, the trial court appointed two other attorneys to represent Townes. Subsequently, Townes moved to dismiss the court-appointed counsel, and invoked his right to self-representation guaranteed by the Sixth and Fourteenth Amendments as interpreted by the Supreme Court in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

The state trial court conducted an extensive and thorough *Faretta* inquiry to determine if Townes was competent to represent himself. Ultimately, and reluctantly, the

court agreed to grant Townes's request and allowed him to proceed *pro se.* From April 22, 1986, through May 5, 1986, Townes represented himself at his trial to a jury in the Circuit Court, City of Virginia Beach. On May 5, the jury returned a verdict of guilty on all counts.

Later the same day, a separate sentencing hearing on the murder charge was conducted. The sentencing jury returned a verdict imposing the death penalty based on its finding beyond a reasonable doubt of "a probability that Townes would commit criminal acts of violence which would constitute a continuing serious threat to society"—a "future dangerousness" finding under the Virginia Code. §§ 19.2–264.2 and –264.4(C). On July 15, 1986, the trial judge confirmed the jury verdict and sentenced Townes to death.

Townes appealed to the Virginia Supreme Court, raising numerous claims. That court upheld his conviction and sentence and the Supreme Court of the United States denied certiorari. *Townes v. Commonwealth,* 234 Va. 307, 362 S.E.2d 650 (1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1249, 99 L.Ed.2d 447 (1988). Townes then sought post-conviction relief by a state habeas proceeding. His petition was dismissed by the trial court, *Townes v. Sielaff,* Circuit Court No. CL88–2669/F–50028; his petition for appeal was refused by the Supreme Court of Virginia, *Townes v. Sielaff,* Record No. 901526 (March 20, 1991), and the Supreme Court of the United States again denied certiorari. *Townes v. Murray,* 502 U.S. 912, 112 S.Ct. 311, 116 L.Ed.2d 253 (1991).

Townes then brought this action for federal habeas corpus relief under 28 U.S.C. § 2254, challenging on constitutional grounds both his conviction and his death sentence. His principal challenges were to imposition of the death sentence and involved two different aspects of the sentencing phase of his state court trial.

The first consisted of a set of separate but confusedly interrelated claims respecting his alleged incapacity effectively to represent himself and/or his competency to stand trial, in that phase. Specifically, he claimed that the state trial court (1) failed adequately in conducting its pre-trial *Faretta* inquiry to advise him of the special perils of self-representation at the capital sentencing phase of his trial, if that were reached; (2) failed to conduct a separate *Faretta* inquiry incident to his self-representation at the sentencing phase, which renewed inquiry was required either as a matter of general Sixth Amendment right in all capital cases or because, in this particular case, Townes suffered an evident loss of capacity for self-representation following return of the jury's guilty verdict; and (3) failed to conduct a competency hearing prior to the sentencing phase of his trial despite his evident loss of legal competency following the jury's guilty verdict.

Townes's second challenge to imposition of the death sentence was a claim that the state trial court violated his right to due process by refusing to instruct the jury of his ineligibility for parole if sentenced to life imprisonment.

Townes's challenges to his conviction included claims of unduly suggestive identification procedures; denial of counsel at a critical stage of the prosecution, specifically a post-arrest "lineup"; *Brady* violations by the withholding of exculpatory evidence; and a plethora of unsupported claims of trial court error.

A magistrate judge considered all the claims asserted in Townes's habeas petition, conducted an evidentiary hearing on the incompetency to stand trial at sentencing claim, and allowed discovery in connection with Townes's *Brady* claim. He then recommended that all the claims be dismissed on alternative procedural default, *Teague* "new rule," and merits grounds.

The district court, reviewing the magistrate judge's Report on objections filed by Townes, made *de novo* findings respecting certain portions objected to, adopted the findings and recommendations in the Report, and dismissed the petition. Preliminarily, the court rejected objections that the magistrate judge erroneously denied discovery of relevant material respecting his *Brady* claim, and that the magistrate judge should have recused himself for manifest bias, then rejected various objections to the magistrate judge's recommendations for denial of

Townes's various constitutional claims respecting the conduct of his state trial.

This appeal followed.

## II

Townes's principal constitutional claims concern his sentencing. He first makes a cluster of related claims concerning the alleged inadequacy of the trial court's *Faretta* inquiry, and of the trial court's efforts to ascertain his competence both to represent himself, and even to assist in his representation, at sentencing. And, he makes a separate claim that the trial court violated his right to due process by refusing to inform the jury that he would be sentenced to life imprisonment without parole if spared a death sentence. We address the issues raised by these separate claims in turn.

## A

As we have noted, Townes's related *Faretta* and "competence" claims assert two distinct violations of his Sixth Amendment right to counsel and a third related violation of his due process right to a fair trial. First, Townes claims constitutional error in the trial court's failure, during its pre-trial *Faretta* inquiry, specifically to apprise Townes of the special perils of self-representation he would face during the capital-sentencing phase if convicted. Second, he claims that his Sixth Amendment rights were again violated when the trial court failed to conduct a separate *Faretta* inquiry after his conviction but before his sentencing. Townes premises this proposed right to a second, renewed *Faretta* inquiry on two alternative bases—that the Sixth Amendment either generally requires trial courts to conduct a separate presentencing *Faretta* inquiry in all capital cases involving *pro se* defendants, or that it requires such a renewed inquiry where, allegedly as here, the return of a guilty verdict causes the defendant a sudden loss of capacity for self-representation that was, or should have been, apparent to the trial court. *See, e.g., United States v. Fazzini*, 871 F.2d 635, 643 (7th Cir.), *cert. denied*, 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989) (noting that "a substantial change in circumstances will require the district court to inquire whether

the defendant wishes to revoke his earlier waiver"). Third, Townes claims that his due process right to a fair trial was violated by the trial court's failure to conduct a pre-sentencing competency hearing in light of the same manifest change of capacity that, he claims, also should have necessitated a renewed *Faretta* inquiry. *See, e.g., Medina v. California*, 505 U.S. 437, 448, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353 (1992) ("If a defendant is incompetent, due process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him."); *Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975).

### 1

■ Townes's challenge to the adequacy of the pre-trial *Faretta* inquiry was properly raised before, and rejected by, the Virginia Supreme Court on Townes's direct appeal. That court found that the trial court conducted a fully adequate *Faretta* inquiry, and that it specifically "impressed upon Townes the necessity and desirability of representation by trained counsel, especially where 'a person . . . is charged with an offense for which the penalty could be death.'" 362 S.E.2d at 656 (quoting trial court). We agree with the district court that the state trial court conducted a full and fair colloquy, sufficiently emphasizing the danger that Townes could be sentenced to death if convicted. Therefore, the district court properly denied relief on this claim.

### 2

■ Townes's second and third claims respecting the state trial court's alleged failures to renew its *Faretta* inquiry and to conduct *sua sponte* a competency hearing before the sentencing phase of his trial, were, by contrast, never raised in the state courts. Clearly, they are distinct from and not properly treated as subsumed within his claim respecting the pre-trial *Faretta* inquiry. Unlike the latter claim, which contends that the pre-trial inquiry was inadequate, the second

claim (in each of its alternative versions) and the third challenge as unconstitutional the trial court's failure to conduct at all the allegedly required proceedings—a renewed *Faretta* inquiry and a competency hearing, respectively. Although now conceding that he "had not previously articulated th[ese] issue[s] with the present degree of specificity," Townes maintains that he "ha[d] challenged the adequacy of the trial court's *Faretta* inquiry with specific reference to the sentencing phase as well as his inability to proceed at that time." Townes's Opening Br., at 28. But that is not enough to satisfy the exhaustion requirement. To do so "the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277–78, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). " 'The ground relied upon must be presented face-up and squarely. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.' " *Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir.) (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir.1988)), *cert. denied*, — U.S. —, 115 S.Ct. 644, 130 L.Ed.2d 549 (1994). Because the snippets from the briefs that Townes filed in the Virginia Supreme Court on direct appeal, and to which he now draws our attention,[1] are wholly inadequate to have "fairly presented" his present claims that he was due a second *Faretta* hearing and/or a competency hearing, these two claims have not been exhausted.

■ Ordinarily, a federal court lacks power to entertain a mixed habeas petition containing exhausted and unexhausted claims. *Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982) (plurality opinion). However, under Virginia's statutory bar to successive petitions, *see* Va.Code § 8.01–654(B)(2) ("No writ shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition."), it is clear that the Virginia courts would not entertain either of these unexhausted claims were Townes now to present them. In this situation, we treat Townes's claims as subject to procedural default unless Townes can satisfy one of the two exceptions to the procedural default doctrine that would excuse his failure to present these claims to the state. *Teague v. Lane*, 489 U.S. 288, 298–99, 109 S.Ct. 1060, 1069, 103 L.Ed.2d 334; *Bassette v. Thompson*, 915 F.2d 932, 936–37 (4th Cir. 1990), *cert. denied*, 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).

■ Townes has made no attempt to satisfy the "cause and prejudice" exception to the procedural default bar. Indeed, it is difficult to imagine what cause there might have been for his failure to raise these arguments in the state courts. Townes argues instead only that a review of his claims regarding post-conviction *Faretta* and competency hearings "is necessary to correct a 'fundamental miscarriage of justice.' " *Coleman v. Thompson*, 501 U.S. at 748, 111 S.Ct. at 2564 (quoting *Engle v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982)). In the capital sentencing context, a "fundamental miscarriage of justice" occurs only when the defendant is "actual[ly] innocen[t]" of the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). To demon-

1. In his opening brief on direct appeal, Townes complained that "[t]here was no inquiry whatsoever made into defendant's knowledge of the death sentencing procedure, and the record indicates a complete lack of preparation for and understanding of what was necessary at that phase of the case in particular." JA 158. In his reply brief on direct appeal, Townes elaborated that

[p]erhaps the most glaring omission from the colloquy between Defendant and the court ... was the absence of any reference to the two-phase aspect of a capital case. Never once does the discussion focus on the fact that, if

found guilty, Defendant would have the right to present mitigating evidence and would be in a position of having to argue for his very life. Never once does the Defendant indicate that he is prepared for such a difficult task. As the fact later revealed, he was not.
JA 160.
Neither contention focuses on Townes's present claims in this habeas proceeding that new hearings were required after his conviction. Whatever merit there might be to his arguments for a new or renewed *Faretta* inquiry and competency hearing, they are clearly afterthoughts.

strate such "actual innocence," the petitioner "must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 335, 112 S.Ct. at 2517.

Beyond conclusorily asserting that "[a] more fundamental miscarriage of justice [than the trial court's failure to conduct the post-conviction inquiries he now identifies as constitutionally required] can scarcely be imagined," Townes's Opening Br., at 30–31, Townes has made no effort to carry his demanding burden. Even assuming *arguendo* that the trial court's failure to conduct post-conviction *Faretta* and/or competency hearings was constitutional error, we are aware of no chain of reasoning—let alone clear and convincing evidence—that leads from the counterfactual hypothetical mandated by *Sawyer* to the conclusion that no reasonable juror could have found Townes eligible for death.[2] See *Dugger v. Adams*, 489 U.S. 401, 410 n. 6, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989) ("Demonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is 'actually innocent' of the sentence he or she received."). Therefore, the district court properly dismissed as procedurally defaulted Townes's claims that the trial court's failure to conduct post-conviction *Faretta* and competency hearings violated his rights to counsel and due process, respectively.

B

■ Townes's other unrelated claim of constitutional error in his sentencing concerns the state trial court's failure to inform the jury that the alternative to a death sentence would be life imprisonment without possibility of parole.[3] At sentencing, the Commonwealth predicated its request that the jury sentence Townes to death on the sole grounds of his alleged future dangerousness. After jury deliberations were underway, the jury emerged from the jury room, and the forewoman and the trial judge had the following colloquy:

Forewoman: There seems to be some question as to parole eligibility requirements in a life sentence.

Court: The question relating to parole eligibility is not a matter appropriate for consideration by the jury. You must base your verdict on the matters that are before you and the ranges of sentence that are set forth in the Court's instruction.

I regret that I can't give you any more answer than that.

After excusing the jury, the court asked both parties whether either had "any objection to the response given by the Court to the jury's question?" Townes answered, "No."

Townes now contends in supplemental briefing which we requested following the Supreme Court's decision in *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), which came down after we heard oral argument, that under that decision the trial court's refusal to inform the jury of his parole ineligibility violated his rights of due process. In response, the Commonwealth argues that the rule laid down in *Simmons* does not apply where, as here, the defendant did not himself attempt to bring the fact of his parole ineligibility before the jury, and that adoption of the broader rule upon which Townes must

---

2. For example, had the trial court conducted a renewed *Faretta* inquiry, and had Townes revoked his earlier waiver of his Sixth Amendment right to counsel, and had appointed counsel succeeded in bringing the fact of Townes's parole ineligibility to the jury's attention, a reasonable juror could still have found Townes eligible for death on the future dangerousness predicate— either because he might "pose a danger to others in prison," *Simmons v. South Carolina*, —— U.S. ——, ——, 114 S.Ct. 2187, 2195, 129 L.Ed.2d 133 (1994) (plurality opinion), or because of the possibility of commutation, pardon, or escape.

*Id.* at ——, 114 S.Ct. at 2201 (O'Connor, J., concurring).

3. The Commonwealth expresses some doubts concerning whether Townes would in fact have been ineligible for parole had he been sentenced to life imprisonment. However, the trial judge clearly assumed at the July 1986 sentencing hearing that Townes would have been parole ineligible and we assume for present purposes that this is so.

rely is precluded by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and its progeny. It argues in the alternative that, even if the rule from *Simmons* is itself broad enough to cover Townes's situation, that rule cannot be applied in this habeas proceeding because that decision created a "new rule" that does not fall within a recognized exception. Lastly, the Commonwealth contends that regardless whether Townes's claim is covered by *Simmons* and regardless whether retroactive application of the rule Townes seeks is *Teague*-barred, Townes procedurally defaulted his claim by failing to lodge a contemporaneous objection to the trial court's decision not to inform the jury that Townes would be ineligible for parole if sentenced to life imprisonment.

We agree with the Commonwealth's first contention and therefore do not reach the questions whether retroactive application of the rule announced in *Simmons* would be barred by the new rule doctrine of *Teague v. Lane* or whether, in any event, Townes's *Simmons*-type claim is procedurally barred.

## 1

Recall that, before the sentencing jury was charged and sent out to deliberate, Townes did not attempt to put the fact of his parole ineligibility before it. That is, he neither adduced evidence that he would be ineligible for parole if sentenced to life imprisonment, nor asked the court so to instruct the jury, nor sought himself to present the point to the jury in his closing argument. The question whether Townes would be eligible for parole if spared a death sentence arose only when the jury returned from its deliberations to inquire of the district court. Accordingly, the district court's nonresponsive answer violated Townes's constitutional rights only if a capital defendant enjoys a constitutional right (at least in cases where the prosecution seeks the death penalty on the grounds of future dangerousness) to have the jury informed about his ineligibility for parole when the jury alone asks for that information (after the defendant could have attempted to divulge it, but did not). Such a right might be freestanding or it might be subsumed within a broader right—for example, a capi-

tal defendant's right to have the sentencing court instruct the jury about the defendant's parole ineligibility on its own initiative, i.e., even absent a request from either the defendant or the jury that such information be imparted.

In specifically contending that *Simmons* held that the Constitution imposes an affirmative obligation upon a trial court to inform the jury of a defendant's ineligibility for parole (if that is the case) whenever a state seeks imposition of the death penalty on the basis of the defendant's future dangerousness, Townes claims that *Simmons* did establish the latter, broader right. If that is a correct reading of *Simmons,* or if *Simmons* at least imposed upon district courts the narrower duty to inform the jury of a defendant's ineligibility for parole when the jury asks for that information, then Townes would come within the rule of that case. In that event, we would be required to address either or both of the Commonwealth's other two arguments in support of its contention that Townes is not entitled to collateral relief—that *Simmons* sets forth a "new rule" within the meaning of *Teague v. Lane,* or that Townes cannot avail himself of the *Simmons* rule for reasons of procedural default. However, for reasons that we will explain, we conclude that the holding of *Simmons* is, in critical respects, narrower than Townes claims. More importantly, it appears to us that, on close analysis, the rule *Simmons* announces is narrower than the rule that Townes needs.

## 2

The defendant in *Simmons* was convicted of capital murder by a South Carolina jury and sentenced to death. Prior to jury selection, the prosecution had requested, and over defense counsel's objection had received, an order prohibiting the defense from mentioning the issue of parole eligibility throughout the trial. Defense counsel was specifically forbidden to question prospective jurors on *voir dire* about parole or the meaning of a "life sentence." During the penalty phase, after Simmons had been convicted, the prosecution argued to the jury that the defendant's future dangerousness was a factor jus-

tifying imposition of the death sentence. Presenting public opinion data which indicated that a large percentage of South Carolinians were uncertain whether a defendant like Simmons sentenced to life imprisonment would ever be paroled, the defense requested the trial court to instruct the jury that, if sentenced to life imprisonment, Simmons would be ineligible for parole. The court refused to issue such an instruction. After some deliberation, the jury specifically asked the court whether "a life sentence carr[ies] with it the possibility of parole." The trial judge refused to answer, instructing the jury that "parole eligibility ... is not a proper issue for your consideration." Shortly afterwards, the jury returned with a sentence of death. —— U.S. at ——–——, 114 S.Ct. at 2190–92. On certiorari from the South Carolina Supreme Court's affirmance of the conviction and sentencing, the United States Supreme Court held, 7–2, that the action of the trial court denied Simmons due process, and remanded for resentencing.

Justice Blackmun's plurality opinion, in which Justices Stevens, Souter, and Ginsburg joined, did arguably at one point state its holding as broadly as Townes claims. *See* —— U.S. at ——, 114 S.Ct. at 2190 ("We hold that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."). One might reasonably question whether the plurality's reasoning which then followed supports such a broad statement of its holding.[4] But such an inquiry is not necessary in order to ascertain the precise scope of *Simmons*, for it is clear that a majority of the *Simmons* Court did not subscribe to that broad a view of the right found violated. Justice O'Connor, writing for herself, the Chief Justice, and Justice Kennedy, concurred only in the judgment. Justice O'Connor's opinion—which rested squarely on a defendant's due process right "to meet the State's case against him," *id.* at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring in the judgment), and neither explicitly nor implicitly recognized that the trial court has a sua sponte duty to inform the jury of a defendant's parole ineligibility—is properly understood to define the holding of the Court. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....' ") (quoting *Gregg v. Georgia,* 428 U.S. 153, 169

---

4. Arguably, the body of that opinion indicates that the due process right that drove the opinion—a capital defendant's right not to be executed " 'on the basis of information which he had no opportunity to deny or explain,' " —— U.S. at ——, 114 S.Ct. at 2194 (quoting *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977))—requires only that the defendant *not be prohibited* from bringing the fact of his parole ineligibility to the jury's attention. *See, e.g., id.* at —— n. 5, 114 S.Ct. at 2195 n. 5 ("The Due Process Clause will not tolerate placing a capital defendant in a straitjacket by barring him from rebutting the prosecution's arguments of future dangerousness with the fact that he is ineligible for parole under state law."); *id.* at ——, 114 S.Ct. at 2196 ("Because truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.").

Additionally, separate opinions by those Justices who joined in the plurality opinion reinforce the suspicion that the *Simmons* plurality really held only that due process *entitles* a defendant to argue from the fact of his parole ineligibility—and not that it imposes a general due process obligation that sentencing juries always be informed of a defendant's parole ineligibility whenever future dangerousness is in issue. Justices Souter and Stevens characterized the plurality as holding that "the defendant has a due process *right to require* that his sentencing jury be informed of his ineligibility for parole." *Id.* at ——, 114 S.Ct. at 2198 (Souter, J., concurring); *see also id.* (concluding, on Eighth Amendment grounds, that "whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant *may demand* instruction on its meaning"); *id.* at ——, 114 S.Ct. at 2199 ("the judge must tell the jury what the term ["life imprisonment"] means, *when the defendant so requests* ") (all emphases added). And Justice Ginsburg concluded that "[w]hen the prosecution urges a defendant's future dangerousness as cause for the death sentence, the defendant's right to be heard means that he must be afforded an opportunity to rebut the argument." *Id.* at ——, 114 S.Ct. at 2199 (Ginsburg, J., concurring).

n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

■ So understood, *Simmons* does not hold, as the plurality opinion at one point put it, that "due process requires that the sentencing jury be informed that the defendant is parole ineligible," *id.* at ——, 114 S.Ct. at 2190 (plurality opinion). It only holds more narrowly that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury—by either argument or instruction—that he is parole ineligible." *id.* at ——, 114 S.Ct. at 2201 (O'Connor, J.). Accordingly, the fact that a jury was not informed of the defendant's parole ineligibility would not violate the defendant's due process rights, as recognized by *Simmons*, if that lack of information was due to the defendant's own inaction. Put in terms familiar from philosophical and jurisprudential debates over the proper meaning of "equality" and "equal protection," the defendant's right, under *Simmons*, is one of opportunity, not of result.

The foregoing analysis suggests, not only that the rule of *Simmons* is not as broad as Townes says that it is, but, more importantly, that it is not as broad as Townes needs it to be. Because a defendant's due process right to meet the case against him does not logically encompass a due process right to have a jury's question about parole eligibility answered straightforwardly when the defendant is in fact parole ineligible, the trial court's nonresponsive answer to the jury's question in the present case did not violate any due process right recognized by *Simmons*. Indeed, that conclusion is reinforced

when we come at the same question from a different angle.

All of the Justices writing opinions specially concurring either in the plurality opinion or in the judgment wrote on the assumption that a defendant would have responded to a state's "future dangerousness" argument by requesting either that the trial court instruct the jury that he would be ineligible for parole if sentenced to life imprisonment or that he be allowed to so inform the jury by argument. Justice O'Connor's opinion emphasizes that the right she recognizes is respected so long as, once the defendant so attempts to meet the case against him, the court grants either one or the other request. *See id.* at —— ——, 114 S.Ct. at 2200–01 (O'Connor, J., concurring in the judgment); *see also id.* at ——, 114 S.Ct. at 2199 (Ginsburg, J., concurring) (agreeing with Justice O'Connor that "due process does not dictate that the judge herself, rather than defense counsel, provide the instruction"). In other words, a majority of the *Simmons* Court specifically did not recognize a right under *any* circumstances, including the defendant's specific request, to have the sentencing judge instruct the jury on the fact of parole ineligibility. A fortiori, *Simmons* does not establish a due process right to have the jury instructed by the court that the defendant is parole ineligible when *the jury* requests such information.

■ In short, the trial court's nonresponsive answer to the jury here did not violate any right recognized by *Simmons.*[5] Consequently, we have no occasion to determine whether *Simmons* established a "new rule" for purposes of federal habeas review and, if so, whether the rule there announced falls within the second *Teague* exception. *See Teague v. Lane,* 489 U.S. 288, 311–13, 109

---

**5.** It bears mention that the trial court not only refused to tell the jury that Townes was parole ineligible but also instructed that "[t]he question relating to parole eligibility is not a matter appropriate for consideration by the jury." To the contrary, *Simmons* makes clear that parole eligibility is an appropriate matter for the jury to consider—at least where, as here, the prosecution has argued future dangerousness. We need not decide whether a trial court would commit constitutional error by effectively instructing a

jury to disregard considerations of parole eligibility when the fact of a defendant's ineligibility for parole had already been communicated to it. Because the jury in this case had been given no information from any source regarding Townes's eligibility or ineligibility for parole, we believe that the trial court's assertion that parole eligibility is essentially irrelevant has no greater significance than does the court's failure to answer the jury's question.

S.Ct. 1060, 1075–77, 103 L.Ed.2d 334 (1989) (plurality opinion).

### 3

In light of our reading that *Simmons* holds only that, when the state puts a capital defendant's future dangerousness in issue, the trial court may not both refuse a defendant's request that it instruct the jury on his parole ineligibility and prevent the defendant from arguing that same point to the jury, Townes can make out a constitutional violation only were we to announce a rule (broader than that expressly laid down in *Simmons*) that the Constitution requires state courts to inform juries of a defendant's ineligibility for parole whenever the jury requests clarification on that question after the defendant has foregone the opportunity to introduce evidence of his parole ineligibility or to argue that fact in closing argument. The final questions, then, are whether the broader rule would have been "new" within the meaning of *Teague* and its progeny when, on March 21, 1988, Townes's conviction became final by virtue of the Supreme Court's first denial of certiorari, and if so, whether it falls within a recognized exception.[6]

We answer the first question in the affirmative, for we conclude that the rule Townes seeks "was not *dictated* by precedent existing" in 1988. *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. In support of his contrary contention that the relief he seeks would not require application of a new rule, Townes relies chiefly upon the several cases which a majority of the *Simmons* Court invoked in support of its holding that the conduct there at issue violated Simmons's rights to due process. *See, e.g., Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding sentencing court's exclusion of mitigating evidence proffered by defen-

dant violative of due process); *Ake v. Oklahoma,* 470 U.S. 68, 83–87, 105 S.Ct. 1087, 1096–98, 84 L.Ed.2d 53 (1985) (due process requires that indigent defendant be afforded assistance of psychiatrist when state presents psychiatric evidence of defendant's future dangerousness at capital sentencing proceeding); *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (sentencing court's imposition of death sentence in partial reliance on aggravating circumstances revealed in presentence report not disclosed to defendant violated due process). This body of precedent cannot aid Townes, though, because the rule that he needs is not easily found within the due process right to be heard. Furthermore, because a majority of the *Simmons* Court specified that that right does not require the trial court itself to instruct the jury on the defendant's parole ineligibility even when the defendant so requests, *Simmons* arguably forecloses a contention that a trial court has a duty, born of the defendant's right to due process, to respond to a jury's request for information about a defendant's parole eligibility (when the defendant is ineligible). *Cf. Caspari v. Bohlen,* —— U.S. ——, ——, 114 S.Ct. 948, 956, 127 L.Ed.2d 236 (1994) (noting possible relevance to *Teague* analysis of Supreme Court decisions decided after petitioner's conviction became final); *Graham v. Collins,* 506 U.S. 461, ——, 113 S.Ct. 892, 900, 122 L.Ed.2d 260 (same).

Townes also argues, however, that such a duty is a correlative of a capital defendant's rights under the Eighth Amendment. Indeed, the possibility that the rule Townes seeks might emerge from the Court's Eighth Amendment jurisprudence is strongly suggested by Justice Souter's concurring opinion in *Simmons.* Joined by Justice Stevens, Justice Souter concluded that the Eighth

---

**6.** Of course, a negative answer to the first question or an affirmative answer to the second would require that we determine whether Townes's failure to file a timely objection to the trial court's nonresponsive answer to the jury could be excused. (Townes did object to the trial court's failure to inform the jury that he was parole ineligible at the post-sentencing hearing when the judge formally confirmed the sentence imposed by the jury. Also, Townes did raise the issue in his direct and collateral proceedings in

state court. So the only possible procedural default arises by operation of Virginia's contemporaneous objection rule, *see* Rule 5:25, *Rules of the Supreme Court of Virginia,* not by operation of Va.Code § 8.01–654(B)(2).) We observe of that alternative defense only that it would present difficult issues of state procedural default law and its application to the unique facts of this case that, in view of our disposition on *Teague* grounds, we need not address in this case.

Amendment permits a defendant to require the court to instruct the jury on the meaning of life imprisonment even if the prosecution does not argue future dangerousness, on the grounds that that "Amendment imposes a heightened standard 'for reliability in the determination that death is the appropriate punishment in a specific case.'" *Simmons,* — U.S. at —, 114 S.Ct. at 2198 (Souter, J., concurring) (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). That same reasoning would seem to invite the rule Townes would have us adopt, for surely the trial court's refusal to respond to the jury's own articulation of their evident confusion, no less than the court's refusal to permit the defendant to anticipate and seek to avert such misunderstanding, would "diminish[ ] the reliability of the jury's decision that death, rather than [the life-without-parole] alternative was the appropriate penalty." *Id.* at —, 114 S.Ct. at 2199.

Significantly, the Court had declared in other pre–1988 decisions that "'the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty .... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.'" *Beck v. Alabama,* 447 U.S. 625, 638 n. 13, 100 S.Ct. 2382, 2390 n. 13, 65 L.Ed.2d 392 (1980) (quoting *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion)). But the Court's 1983 decision in *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), which upheld against constitutional challenge a state statute requiring courts to instruct sentencing juries that the governor could commute a life sentence without possibility of parole to a lesser sentence, could have been read to indicate that the "factors which may call for a less severe penalty" that count for Eighth Amendment purposes do not include possible post-conviction contingencies. *See id.* at 1014, 103 S.Ct. at 3460 (holding that, notwithstanding the Eighth Amendment, "the wisdom of the decision to permit juror consideration of possible commutation is best left to the States"). Because of the potential tension between *Ramos,* on the one hand, and

the caselaw exemplified by such decisions as *Woodson, Lockett,* and *Beck,* on the other, we cannot conclude that Eighth Amendment jurisprudence existing at the time Townes's conviction became final made clear that a jury's decision to impose the death penalty despite their uncertainty regarding whether the defendant would be eligible for parole if sentenced instead to life imprisonment would have amounted to cruel and unusual punishment.

The foregoing analysis directs the conclusion that the rule Townes would have us adopt was not "compelled by existing precedent," *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990), in March 1988. Therefore, we are without authority to adopt it on habeas review of Townes's conviction unless it falls within one of two exceptions. *E.g., Graham, supra,* 506 U.S. at —, 113 S.Ct. at 897; *Teague,* 489 U.S. at 316, 109 S.Ct. at 1078. Plainly, the first *Teague* exception—for rules that "place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073 (internal quotation omitted)—is inapplicable. The final question, therefore, is whether the new rule Townes seeks would "implicate the fundamental fairness," *id.* at 312, 109 S.Ct. at 1076, of the sentencing proceeding.

While we recognize that divining what constitutes a "watershed rule[ ] of criminal procedure," *id.* at 311, 109 S.Ct. at 1076, will not always be an analytically neat matter, we think it clear that the rule Townes seeks does not qualify. To put the point simply, the preceding inquiry into whether Townes's desired right would require a "new rule" of constitutional law reveals more than that that rule was not "compelled" by precedent existing in 1988. It also indicates at least a substantial possibility that a majority of the Supreme Court would have denied in 1994 that the Constitution recognizes such a rule at all. We are hard-pressed to believe that, as a lower court, we may acknowledge that a very recent Supreme Court decision casts significant doubt on the existence of a given rule as a matter of constitutional law yet hold that the rule is nonetheless "implicit in the

concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).

In summary, even if the rule announced in *Simmons* were not new, the rule that Townes seeks is. Therefore, it can be applied retroactively only if it implicates a fundamental right. As to that question, again without addressing whether the rule of *Simmons* affects fundamental rights, it is clear that the broader rule does not. Since we cannot hold that the trial court's refusal to respond to the jury's question regarding Townes's eligibility for parole if spared a death sentence violated any rule of constitutional law recognized by the time Townes's conviction became final, Townes is not entitled to collateral relief on this claim.

## III

Townes raises four other claims of error; three concerning evidentiary issues raised in his state court trial, one involving the impartiality of the federal magistrate judge assigned to conduct a hearing into claims made in Townes's habeas petition. We agree with the district court that all are without merit.

### A

■ According to the Supreme Court of Virginia's opinion in this case:

> Dorothy Moore, who patronized the Majik Market two or three times a week, arrived at the store about 2:00 a.m. on her way home from work. Goebel was behind the counter, and Moore chatted with her briefly. Moore thought Goebel was "acting really strange, nervous."
>
> Moore walked to the rear of the store to get a soft drink and was startled by a man standing "in the back corner ... just watching," with his arms crossed "[l]ike [he had] something in his hand." He gave Moore "this smile," but did not speak. She obtained a bottle or can of Coca Cola and proceeded to the cashier's counter. After paying Goebel for her soft drink, Moore asked Goebel whether she was "sure everything [was] okay." Although "acting scared," Goebel replied she was "fine" and told Moore to leave because she needed "to lock the doors."
>
> ....
>
> Dorothy Moore learned of the murder mid-morning of April 14, but she did not contact the police for four weeks. On May 29, a detective showed her photographs of six men. She picked two of the men, including Townes, as suspects and told the officer she "could better [make an identification] in a lineup." On June 5, she attended a live lineup which included Townes and four other men. She made a positive identification of Townes as the man she had seen in the Majik Market on the night of Goebel's murder.

362 S.E.2d at 653–54. Townes asserts, and the State does not dispute, that none of the four other men was the "other" person (besides Townes) she picked out of the photo array. Townes argues that by permitting him to be the only constant between the initial photo array and the live lineup—when Moore identified another, equally possible, suspect from the photo array—Virginia Beach authorities unreasonably and impermissibly suggested to Moore that Townes was the person she saw in the Majik Market. According to Townes, the type of conduct in which the Commonwealth engaged in this case was precisely that condemned by the Supreme Court in *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

The Commonwealth seeks to distinguish *Foster* on its facts—in that case the police arranged multiple encounters between accused and witness—and argues that under the totality of the circumstances test of *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), Moore—who observed Townes under favorable conditions of light and proximity—could make a reliable and admissible identification.

There is certainly no flat prohibition against making the same individual be the one constant in a photospread and at a lineup. *See United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir.1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 1764, 68 L.Ed.2d 241 (1981). And unlike *Kimbrough v. Cox*, 444 F.2d 8 (4th Cir.1971), this is not a case

where the witness was presented with a picture of the accused alone. Rather, Moore saw photos of six suspects from which she identified Townes as a "possible", confirming this suspicion at the subsequent line-up. Given the favorable conditions under which the witness observed Townes on the night of the murder, and the lack of any unconstitutional suggestiveness at the lineup itself, we cannot find that the district court abused its discretion in denying this claim.[7]

## B

■■■ Townes was also identified by Herman F. Christenbury as the man who, on April 10, 1985, a few days before the Goebel murder, called at Christenbury's home in response to an ad Christenbury had placed in a local paper for the sale of a Star brand .45 caliber automatic handgun. According to Christenbury, Townes bought the gun, paying for it in cash. Although the actual murder weapon was never recovered, there is apparently no dispute that this type of gun was the kind that killed Goebel.

Christenbury later identified Townes at a lineup where Townes did not have counsel present. Due to the absence of counsel, the trial court suppressed the evidence of that identification. However, the court allowed Christenbury to identify Townes in-court because it was derived from for a source sufficiently independent of the uncounseled lineup (i.e. Townes's visit to Christenbury's home) to remove any taint resulting therefrom.

The district court held Christenbury's in-court identification of Townes constitutionally admissible. The court noted that despite the improperly conducted lineup, Christenbury's

> contact with the defendant was so clear and precise that his testimony identifying the petitioner as the man who came to his home and to whom he sold a pistol of the type specifically used in the slaying of Virginia Goebel, was allowed into evidence. It was for the jury to determine his credibility. There was no question with regard to admissibility.

We agree. In *United States v. Wade,* 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967), the Court enumerated several factors for courts to employ in "mak[ing] the determination whether the in-court identifications had an independent origin" other than a "tainted" lineup identification. Among the factors is "the prior opportunity to observe the alleged criminal act". *Id.* at 241, 87 S.Ct. at 1940. Christenbury's assertion that he and Townes were alone in his kitchen, carrying on a conversation, for at least ten minutes provides a sufficient independent basis for the trial court to have permitted his in-court identification.

## C

■■■ As his last claim of trial error, Townes alleges a violation of his due process and Sixth Amendment rights to obtain material and exculpatory evidence in the prosecution's possession in a timely and adequate fashion. *See Brady v. State of Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Although Townes asserts that there were several "discovery/ due process violations," he focuses particularly on the prosecution's alleged failure to turn over credit card receipts from the convenience store (which pertain to the persons in the store on the night of the murder). The Supreme Court of Virginia found "that Townes was given information concerning the credit card purchases well in advance of the first day of trial." 362 S.E.2d at 660. As for further, post-conviction discovery, the magistrate judge and district court found that petitioner could not establish "good cause" as required by Rules Governing Section 2254 Cases in the United States District Courts, specifically Rule 6(a), before discovery requests are granted. This was a discretionary ruling in which we find no abuse.

## D

■■■ Townes argues that although the magistrate judge *"initially* appeared to take Petitioner's habeas petition seriously," that early solicitude was "quickly replaced by a callous attitude towards both Petitioner and

7. We also affirm the finding of the Virginia Supreme Court and the district court that Townes' then-counsel was present during the June 5, 1985 line-up.

[his] counsel, which could only have been based upon events outside of the record." Townes's Opening Br., at 42–43.

In assessing this claim of partiality, the district judge found that "[t]here is no evidence that the Magistrate Judge's opinion was affected by anything other than the merits of the case." We find no reason to disturb this ruling.

### IV

Finding no error requiring reversal of the district court's dismissal of Townes's habeas petition, we affirm its judgment.

*SO ORDERED.*

LUTTIG, Circuit Judge, concurring in part and concurring in the judgment:

I join all of the majority opinion except for Part II.B.1–2. I cannot join Part II.B.1–2 because in that section the court addresses the merits of Townes' principal claim under *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), in disregard of the Supreme Court's recent directive in *Caspari v. Bohlen,* —— U.S. ——, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994), and our circuit's decision only two months ago in *Gray v. Thompson,* 58 F.3d 59, 64 (4th Cir. 1995). In *Caspari,* the Court squarely held that "if the State ... argue[s] that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim." —— U.S. at ——, 114 S.Ct. at 953 (emphasis in original); *see also Gray,* 58 F.3d at 64 ("[T]he Supreme Court made clear [in *Caspari* ] that federal courts must analyze whether a habeas petitioner seeks to extend the boundaries of existing law before considering the merits of the claim, if the state so argues.") (citation omitted).

The reasons for the Supreme Court's prohibition, and in turn our own circuit's prohibition, on considering the merits until *after* retroactivity has been considered were well established even before *Teague* was decided:

> We conclude ... that [it was] ... error [for] ... the Court of Appeals [to] ... reach[ ] out to decide that *Almeida–Sanchez* [*v. United States,* 413 U.S. 266, 93

S.Ct. 2535, 37 L.Ed.2d 596 (1973) ] applied to checkpoint searches in a case that did not require decision of the issue.

> . . .

> This Court consistently has declined to address unsettled question regarding the scope of decisions establishing new constitutional doctrine in cases in which it holds those decisions nonretroactive. This practice is rooted in our reluctance to decide constitutional questions unnecessarily. Because this reluctance in turn is grounded in the constitutional role of the federal courts, *the district courts and courts of appeals should follow our practice, when issues of both retroactivity and application of constitutional doctrine are raised, of deciding the retroactivity issue first.* As the Court of Appeals correctly decided in this case that *Almeida–Sanchez* did not apply to a 1971 search, *it should have refrained from considering* whether our decision in that case applied to searches at checkpoints.

*Bowen v. United States,* 422 U.S. 916, 920–21, 95 S.Ct. 2569, 2573, 45 L.Ed.2d 641 (1975) (citations omitted and emphasis added); *see also Goeke v. Branch,* —— U.S. ——, ——, 115 S.Ct. 1275, 1278, 131 L.Ed.2d 152 (1995) (*per curiam* ) ("We do not (and we *may not,* in the face of the State's invocation of *Teague* ) reach the merits of that contention." (emphasis added)).

Here, petitioner argues that he is entitled to the benefit of the rule announced in *Simmons,* a case that post-dates the finality of his conviction. The state in turn contends that the *Simmons* rule is "new" and therefore, under *Teague,* unavailable to Townes. Therefore, our first inquiry *must* be whether, under *Teague, Simmons* announced a new rule or whether that case instead was a mere application of an existing rule of law.

The majority circumvents the holdings of *Caspari* and *Gray* by introducing into the "new rule" analysis, and then answering, what it characterizes as an inquiry antecedent to the *Teague* inquiry, namely whether the case whose benefit petitioner seeks would actually govern disposition of petitioner's case. *See* op. at 848. Transparently, this

question is identical to that raised by petitioner's claim on the merits; this is confirmed by the fact that had the majority concluded that Townes "really did" seek the rule of *Simmons* and that reliance upon *Simmons* was not barred by *Teague,* then its analysis of the merits of Townes' claim would be precisely that undertaken in Part II.B.1–2. Indeed, in apparent recognition of this, in *Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), the Supreme Court considered and rejected *exactly* the same framework that the majority adopts in order to avoid the *Teague* inquiry:

> At the outset we note that the parties dispute whether *Caldwell* [*v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ], even if its rule applies, could support any claim for relief in petitioner's case. The State emphasizes that [*Caldwell* was narrower than petitioner asserts].... We need not address the significant questions concerning the merits of petitioner's *Caldwell* claim on these facts, or the question whether application of *Caldwell* to the facts presented here would itself involve a new rule of law. Rather, we address only whether *Caldwell* is available to petitioner [under *Teague* ] as a ground upon which he may seek relief.

*Sawyer,* 497 U.S. at 233–34, 110 S.Ct. at 2827.

The implications of the majority's approach for the disciplined decisionmaking that was purposely imposed by the *Coleman* and *Gray* rule are significant. Apart from further relegating the Supreme Court's decision in *Teague v. Lane* in this circuit to a rule of little or no practical consequence, *see also Turner v. Williams,* 35 F.3d 872 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1359, 131 L.Ed.2d 216 (1995), the methodology employed by the majority gives panels of this court license to issue what in essence are advisory opinions on significant constitutional questions which, because they are *Teague*-barred, are not even cognizable on federal *habeas.* Here, for example, our circuit is henceforth bound by the majority's interpretation of *Simmons*—an interpretation with which, this time, I happen to agree—when the scope of that decision is not even properly before the court.

I would decide the question we are required by *Caspari* and *Gray* to decide, namely whether *Simmons* announced a new rule of constitutional law, and hold that *Simmons* is a new rule and thus unavailable to petitioner under *Teague. Cf. Stewart v. Lane,* 60 F.3d 296, 301 (7th Cir.1995) (holding that *Teague* bars application of *Simmons* to a conviction final in 1985).

It is implausible that a reasonable jurist, considering the matter in 1988, would have felt compelled to hold that petitioner had a constitutional right to have the jury instructed on his parole ineligibility. At that time, a jurist would have been confronted with *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), which repeatedly emphasized that the decision about whether to inform the jury about such matters is to be left to the discretion of the states and, indeed, which cited "approv[ingly]," *see Simmons,* —— U.S. at ——, 114 S.Ct. at 2200 (O'Connor, J., concurring in the judgment), a Georgia statute "prohibiting argument as to possibility of pardon, parole, or clemency," and the practice of "[m]any state courts" to likewise prohibit such instructions, *Ramos,* 463 U.S. at 1013 n. 30, 103 S.Ct. at 3460 n. 30. That jurist would also have faced our circuit's decision in *Turner v. Bass,* 753 F.2d 342, 354 (4th Cir.1985), *rev'd on other grounds,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (expressly holding that "while it is constitutionally permissible to instruct the jury on the subject of parole, such an instruction is not constitutionally required" (citing *Ramos* )) and the Fifth Circuit's decision in *O'Bryan v. Estelle,* 714 F.2d 365, 389 (5th Cir.1983) ("[W]e cannot say that an instruction on parole is constitutionally mandated in a capital case."). In the face of such strong contrary Supreme Court and circuit precedent, it would be baseless to claim that no reasonable jurist could have held—in 1988—that the Constitution did not require a jury instruction on parole ineligibility.