PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JERRY BRIDWELL MCWEE,
          *Petitioner-Appellant,*

v.

WILLIE WELDON, Warden of Leiber
Correctional Institution; CHARLES M.
CONDON, Attorney General of the
State of South Carolina,
          *Respondents-Appellees.*

No. 01-21

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Henry M. Herlong, District Judge.
(CA-00-3865-4-20BF)

Argued: January 23, 2002

Decided: March 4, 2002

Before LUTTIG, MICHAEL, and KING Circuit Judges.

---

Dismissed by published opinion. Judge Luttig wrote the opinion, in
which Judge Michael and Judge King joined.

---

## COUNSEL

**ARGUED:** John Frank Hardaway, Columbia, South Carolina;
Melissa Reed Kimbrough, Columbia, South Carolina, for Appellant.
Donald John Zelenka, Assistant Deputy Attorney General, SOUTH
CAROLINA OFFICE OF THE ATTORNEY GENERAL, Columbia,

South Carolina, for Appellees. **ON BRIEF:** Charles M. Condon, Attorney General, John W. McIntosh, Chief Deputy Attorney General, SOUTH CAROLINA OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina, for Appellees.

## OPINION

LUTTIG, Circuit Judge:

During a robbery of a rural convenience store on July 6, 1991, Jerry McWee shot to death John Perry, the store clerk. A jury convicted McWee of murder and armed robbery, and the trial judge, pursuant to the jury's recommendation, sentenced McWee to death. McWee now presents several issues to this court on appeal from the district court's denial of federal habeas relief. The first three claims, pertaining to the trial court's refusal to instruct the jury on McWee's parole eligibility if sentenced to life imprisonment, were adjudicated on the merits and rejected by the South Carolina Supreme Court. *See State* v. *McWee*, 472 S.E.2d 235 (S.C. 1996). McWee's remaining claims that his trial counsel was ineffective were adjudicated on the merits and rejected by the South Carolina post-conviction review (PCR) court. A. 3672-3737. We conclude that McWee is not entitled to habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) because the decisions of the South Carolina state courts were neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, we deny McWee's motion for a certificate of appealability, and dismiss his appeal.

### I.

At McWee's trial, his attorneys repeatedly asked the judge to instruct the jury that if it recommended a sentence of life imprisonment, rather than death, McWee would not be eligible for parole until he served a minimum of thirty years in prison.[1] The issue first arose

---

[1]South Carolina law, at that time, provided as follows:

A person who is convicted of or pleads guilty to murder must

prior to jury selection, where McWee's attorneys sought to question prospective jurors about their understanding of parole eligibility and the meaning of life imprisonment. In a discussion between the trial judge, the prosecutors, and McWee's attorneys over whether the lawyers would be allowed to voir dire on issues relating to parole eligibility and the meaning of life imprisonment, the trial judge initially indicated that he would charge the jury on McWee's thirty-year parole ineligibility. J.A. 14 (statement of trial judge) ("I would charge that statute [referring to S.C. Code Ann. § 16-3-20(A)]."). At the end of the discussion, however, and prior to the commencement of voir dire, the trial judge ruled that he would not permit voir dire questions about parole eligibility and the meaning of life imprisonment. The judge left open the issue of whether he would, during the penalty phase of McWee's trial, charge the jury on McWee's thirty-year parole ineligibility. J.A. 34 (statement of trial judge to McWee's counsel) ("[W]*e'll address . . . at a later time* whether or not you want that [parole eligibility] in your general charge.").

At the penalty phase of McWee's trial, McWee's attorneys again asked the judge to charge the jury on McWee's thirty-year parole ineligibility. The trial judge refused, and instead instructed the jury that the terms "life imprisonment" and "death penalty" should be given their plain and ordinary meaning. J.A. 97. McWee raises three claims based on the trial court's failure to instruct the jury on McWee's thirty year parole ineligibility.

## A.

McWee's first claim is that the trial court violated his due process rights by "reneging" on a "promise" made to McWee's trial counsel

---

be punished by death or by imprisonment for life and is not eligible for parole until the service of twenty years; provided, however, that when the State seeks the death penalty and an aggravating circumstance is specifically found beyond a reasonable doubt . . ., and a recommendation of death is not made, the court must impose a sentence of life imprisonment without eligibility for parole until the service of thirty years.

S.C. Code Ann. § 16-3-20(A) (Supp. 1993).

prior to voir dire, that the court would in fact charge the jury on McWee's thirty-year parole ineligibility. McWee contends that this "promise" to charge the jury shaped his trial counsel's strategy during voir dire, jury selection, and presentation of evidence. And he argues that the trial court's subsequent refusal to instruct the jury on parole was a "breach of fundamental fairness" and a violation of due process. Appellant's Br. at 12-18.

As an initial matter, McWee has mischaracterized the facts by quoting statements made by the trial judge outside of their full context. Having examined the entire pre-voir dire discussion among the trial judge, the prosecutors, and McWee's attorneys, J.A. 14-40, it is obvious that the trial court did not "promise" anything regarding a parole eligibility charge. Although the judge initially indicated he would give a thirty-year charge, J.A. 14, later in the discussion the prosecutor suggested to the judge that such a charge would be improper under *State* v. *Torrence*, 406 S.E.2d 315 (S.C. 1991). J.A. 32-33. The trial judge then asked McWee's lawyers, "Let me get this straight. Without the jury's request, *you are asking me* to charge that statute in my general charge?" J.A. 34 (emphasis added). Finally, the trial judge said to McWee's lawyers "*we'll address . . . at a later time* whether or not you want that in your general charge." J.A. 34 (emphasis added). These statements confirm that the trial judge did not "promise" McWee that he would give a thirty-year parole ineligibility charge before voir dire, and, in fact, explicitly left the issue open to be decided at a later time.

In any event, the South Carolina Supreme Court adjudicated McWee's claim on the merits and rejected it, concluding that the trial court's initial indication that it would give a parole eligibility charge had no influence on voir dire, jury selection, or presentation of the evidence. *State* v. *McWee*, 472 S.E.2d at 238. McWee has failed to meet the statutory requirement for habeas relief by demonstrating that this state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1).

Because the record indicates that the trial judge made no promise to McWee's counsel regarding the parole eligibility charge, we need

not decide whether clearly established Supreme Court precedent holds that a trial judge's unkept promise to instruct a jury on parole violates due process. We note, however, that McWee's reliance on *Knox* v. *Collins*, 928 F.2d 657 (5th Cir. 1991), is unavailing to the extent that *Knox* is not a Supreme Court decision, and as a pre-AEDPA case, it did not purport to interpret "clearly established federal law, as determined by the Supreme Court of the United States."

B.

McWee's second and third claims are that the trial court's failure to instruct the jury that, if sentenced to life in prison, he would not be eligible for parole until he served thirty years, was contrary to or an unreasonable application of *Simmons* v. *South Carolina*, 512 U.S. 154 (1994). The South Carolina Supreme Court also rejected these claims, holding that *Simmons* did not apply to McWee's sentencing proceeding because a life sentence for McWee would have included the possibility of parole. *McWee*, 472 S.E.2d at 238.

The state court's decision was neither contrary to nor an unreasonable application of *Simmons*. Justice O'Connor's concurrence in *Simmons*, which represents the holding of that case, *see Mu'min* v. *Pruett*, 125 F.3d 192, 199 (4th Cir. 1997), explicitly limits the right to inform a jury of parole ineligibility to the circumstance where the prosecution places the defendant's future dangerousness in issue and the only available alternative sentence to death is life imprisonment without the possibility of parole. *See Simmons*, 512 U.S. at 178 (O'Connor, J., concurring in the judgment) ("Where the state puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury — by either argument or instruction — that he is parole ineligible."). And we have repeatedly held that section 2254(d)(1) prohibits a federal habeas court from extending the right established in *Simmons* to sentencing proceedings where "life imprisonment" includes any possibility of parole. *See Roach* v. *Angelone*, 176 F.3d 210, 220 (4th Cir. 1999); *Keel* v. *French*, 162 F.3d 263 (4th Cir. 1998); *Wilson* v. *Greene*, 155 F.3d 396, 407-08 (4th Cir. 1998); *Arnold* v. *Evatt*, 113 F.3d 1352, 1363 (4th Cir. 1997). If the right recognized in *Simmons*

is to be extended in the manner McWee seeks, that extension must be effected on direct review, not on collateral attack.

## II.

McWee next contends that the performance of his trial attorneys, Carroll Bryant and James Huff, fell below the constitutional minimum for effective assistance of counsel because they: 1) did not contest McWee's competence to stand trial and they did not present an insanity defense; 2) did not conduct a reasonable investigation into McWee's social history; and 3) did not attempt to suppress evidence from a 1992 psychiatric evaluation conducted at the William S. Hall Institute. Under section 2254(d)(1), our review is limited to the determination of whether the South Carolina post-conviction review (PCR) court reasonably applied *Strickland* v. *Washington*, 466 U.S. 668 (1984), and Supreme Court precedents interpreting *Strickland*, in rejecting McWee's ineffective assistance of counsel claims. Under *Strickland*, a criminal defendant who claims that his trial attorney's performance violated his Sixth Amendment right to counsel must establish that his counsel's representation fell below "an objective standard of reasonableness" by making errors "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," 466 U.S. at 687-88, and that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In attempting to establish a violation of his Sixth Amendment right to counsel, the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as we are to apply a "heavy measure of deference to counsel's judgments." 466 U.S. at 689-91.

## A.

## 1.

The facts surrounding McWee's claims that Bryant and Huff should have contested his competency to stand trial and offered an insanity defense are as follows. During the penalty phase of the trial, Bryant and Huff called to the stand Dr. John Whitley, a psychiatrist who met with McWee eight times from May 12, 1992 through May

19, 1993. Dr. Whitley gave lengthy and exhaustive testimony at the penalty phase regarding his eight visits with McWee and his diagnoses of McWee's mental condition. Dr. Whitley testified that McWee was mentally ill, suffering from "severe depression," "psychosis," and "command hallucinations." J.A. 136-90. During his penalty phase testimony, however, Dr. Whitley never suggested that McWee lacked the capacity to distinguish moral or legal right from moral or legal wrong, nor did he assert that McWee lacked a rational and factual understanding of the judicial proceedings against him. Dr. Whitley offered the following account of McWee's shooting of Perry:

> [McWee] continued to have hallucinations from Eddie [McWee's deceased cousin] who insisted that he join him and he shoot himself. On the day of the alleged shooting, Jerry remembers that he had a gun in his back from Scott, the man that went with him. He said Scott told him that if he did not shoot the clerk, that Scott would kill him and all his children. Jerry said that he became the clerk. And my feeling is that secondary to the command hallucination, Jerry followed this command that he kill, he shot. At this time, but he shot himself, which in reality is the clerk that he killed.

J.A. 153-54.

Dr. Donald Morgan, the state's psychiatric witness, had a different opinion on McWee's mental condition. He testified during the penalty phase that McWee was "malingering," in other words, faking a mental illness by claiming to have seen and spoken to his deceased sister. J.A. 133. He further testified that McWee did not have psychotic depression because McWee was observed playing table games, talking on the phone, and interacting normally with other patients during his time at the William S. Hall Institute, activities which are incompatible with such a condition. J.A. 468.

Although Bryant and Huff presented Dr. Whitley's testimony regarding McWee's mental condition at the penalty phase in an effort to persuade the jury that McWee should not be sentenced to death, McWee now argues that Bryant and Huff did not go far enough, and that they should have contested McWee's competency to stand trial

and presented an insanity defense. In support of this, McWee relies on Dr. Whitley's subsequent testimony in the state post-conviction review proceeding. In that proceeding, Dr. Whitley insisted that McWee was not competent to stand trial, J.A. 424, lacked the capacity to distinguish moral or legal right from moral or legal wrong at the time he shot Perry, J.A. 426, and that executing McWee would be "an abomination and blasphemy on justice." J.A. 458. Dr. Whitley admitted that he did not tell Bryant and Huff of his opinion that McWee was incompetent to stand trial and incapable of distinguishing moral or legal right from moral or legal wrong at the time of the shooting, but faulted Bryant and Huff for never discussing with him nor inquiring about McWee's competency to stand trial or eligibility for an insanity defense. J.A. 426-28, 435.

The state PCR court rejected McWee's claims that Bryant and Huff were ineffective for failing to contest his competency to stand trial and for failing to present an insanity defense, and discounted Dr. Whitley's post-conviction testimony as "suspect." A. 3689. The state PCR court credited Huff's testimony that he *did* discuss *M'Naghten* with Dr. Whitley, and that he gave Dr. Whitley copies of South Carolina statutes. J.A. 390. The state PCR court also made a specific factual determination that "trial counsel asked Dr. Whitley to inform them if there were any mental health defenses available to McWee." A. 3689. This determination of fact made by the state court is presumed correct, *see* 28 U.S.C. § 2254(e)(1), and McWee has not attempted to rebut this presumption with clear and convincing evidence.

2.

Turning to the merits of McWee's claims, we conclude that McWee has failed to establish that the state PCR court unreasonably applied *Strickland* in rejecting his claim that Bryant and Huff's failure to contest his competency to stand trial violated his Sixth and Fourteenth Amendment rights to effective assistance of counsel. To be competent to stand trial, a criminal defendant need only have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Godinez* v. *Moran*,

509 U.S. 389, 396 (1993). McWee was undoubtedly competent to stand trial under this standard.

McWee was twice evaluated at the William S. Hall Institute before his trial and found competent to stand trial each time. J.A. 468, 470. Moreover, McWee was lucid and rational in his communications with Bryant and Huff, J.A. 285, 351, which included discussions of legal theory, strategy, and witnesses to call. J.A. 365-66. Finally, McWee testified at length at his trial and gave competent and clear answers to every question asked of him. He further testified that he had discussed his constitutional rights with his attorneys before deciding to testify on his own behalf. Supp. J.A. 80-81.

Because the record in this case demonstrates that McWee was unquestionably competent to stand trial, Bryant and Huff's failure to contest McWee's competency did not violate McWee's Sixth Amendment right to counsel, and the state PCR court reasonably applied *Strickland* in rejecting this claim.

3.

The state PCR court also reasonably applied *Strickland* in concluding that Bryant and Huff did not violate McWee's right to effective assistance of counsel by failing to present an insanity defense. Under South Carolina law, an insanity defense is available only if, "at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong." S.C. Code Ann. § 17-24-10(A).

Dr. Whitley's unexplained and conclusory assertion in the state post-conviction proceedings that McWee was insane at the time of the shooting is insufficient to establish that Bryant and Huff were ineffective in failing to present an insanity defense, in light of the overwhelming evidence in the record that McWee was criminally responsible under South Carolina law. Dr. Whitley did not even review McWee's statements to his attorneys before making his assessment that McWee was insane at the time he shot Perry. J.A. 443-44. Had Dr. Whitley reviewed these statements, he would have

learned that McWee confided to Bryant and Huff that he felt guilt after the shootings, J.A. 362 — clear evidence of his capacity to distinguish right from wrong. McWee further explained to his attorneys how he and his accomplice premeditated the crimes by casing the store in advance to make sure there were no video cameras and obtaining bullets the night before. J.A. 280-81. Dr. Whitley's conclusion that McWee was an insane man who could not tell right from wrong was reached without consideration of these meticulous actions taken in advance of the crime.

In addition, Bryant and Huff testified that McWee gave them only two accounts of the shooting: 1) "that the gun had gone off, the first bullet entered the victim and then he said in a reflex action he cocked the gun again and it went off again." J.A. 268; 350-51. 2) "[Scott] had come up behind him and threatened him and said, if you don't shoot this man then I'm going to harm your family or something to that effect." *Id.* McWee *never* told his attorneys anything about a command hallucination or that he felt like he was really shooting himself when he shot the victim. Finally, it is worth noting that McWee was twice evaluated at the William S. Hall Institute before his trial and found not to be insane under South Carolina law on each occasion. J.A. 468; 470.

We also reject McWee's claim regarding Bryant and Huff's failure to present an insanity defense because an insanity defense would have hindered McWee's efforts to use his expressions of remorse and acceptance of responsibility for what he had done as a potential mitigating circumstance. McWee testified, at the penalty phase of his trial that:

> To be honest with you, it made me feel bad that I could have taken somebody away from somebody else. . . . I just wish that I could take time back and make sure that none of this ever happened. I'm not proud of it. And I regret doing it. I feel that I've done a great dishonor to Ms. Perry and her children. And I'm very sorry for doing it.

Supp. J.A. 155-56. McWee further stated to the jury at the penalty phase, before his counsel's closing argument:

I am extremely remorseful for the course of events. If I could turn back time I'd make sure this horrible injustice could have never happened. I have many regrets, but the one that I wish the most that I could change is the pain that I have caused. I have realized the extent of anguish that I have inflicted not only Mrs. Perry but on my family.

J.A. 212. As in *Strickland*, McWee's attorneys decided to "rely as fully as possible on [their client's] acceptance of responsibility for his crimes" in their efforts to stave off the death penalty. *Strickland*, 466 U.S. at 699. Had McWee's attorneys argued before the jury that McWee was insane, and incapable of distinguishing moral or legal right from moral or legal wrong at the time of the shooting, McWee's post-conviction expressions of remorse and acceptance of responsibility would have lacked credibility.[2] Instead, McWee's attorneys made arguments and presented testimony in a manner consistent with McWee's remorseful attitude and his desire to accept responsibility for his actions.

In light of the "heavy measure of deference to counsel's judgments" that *Strickland* requires, and especially considering the fact that an insanity defense would have interfered with counsel's chosen strategy in persuading the jury to spare McWee's life because he was

---

[2]Moreover, if Bryant and Huff had presented a meritless or weak insanity defense at trial, they could have lost credibility with the jury, and their efforts in the penalty phase to use McWee's alleged mental *problems* (such as depression, psychosis, and command hallucinations) as a potential mitigating factor would likely have met a more skeptical audience. In fact, McWee's lawyers were careful to assure the jury that although they believed McWee's mental condition was a mitigating factor that should spare him the death penalty, they emphasized that they did not believe it excused his shooting of Perry or absolved him of guilt. During his closing argument in the penalty phase, as he asked the jurors to spare McWee the death penalty, Huff emphasized: "No one is saying Jerry is mentally insane. . . . What we have said to you is that Jerry had mental problems at the time these events occurred. Not to the degree that you can forgive him. Please understand that. But that it is something that you can, and I submit should consider as to how these crimes occurred. . . . It doesn't excuse what Jerry did but I hope it can help you see what he was going through at the time he did the crime." J.A. 215-16.

remorseful and accepted responsibility for his actions, we conclude that the state PCR court reasonably applied *Strickland* in rejecting this claim.

B.

McWee further claims that the state PCR court unreasonably applied *Strickland* in rejecting his claim that Bryant and Huff should have conducted a more thorough investigation into his background. Although Bryant and Huff hired Patti Rickborn to investigate McWee's background, the information Rickborn provided was "sparse." J.A. 288. Because Bryant and Huff did not continue to investigate McWee's background beyond Rickborn's superficial report, they did not obtain the medical records of some of McWee's family members, which would have revealed a family history of mental illness that could have been used as mitigating evidence.[3] J.A. 336-37. The state PCR court, however, held that "trial counsel conducted a reasonable investigation into McWee's social history and . . . trial counsel made a strategic decision on how to proceed," and that such strategy "obviated the need for a fuller investigation into McWee's social background." A. 3683-85. The PCR court found that Bryant and Huff's strategy was to argue to the jury that McWee had a good family history, and investigating and presenting evidence of a family history of mental illness would have been inconsistent with this chosen strategy. A. 3686; J.A. 218.

Under *Strickland*, counsel has a duty "to make a reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. However, the reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strong-

---

[3]McWee claims that "every member of [McWee's] family — his mother, father, sister, and brother — has been, and continues to be, treated for . . . depression, anxiety, migraines, suicidality, fainting spells, and neurosis. Likewise, [McWee's] daughters and his nieces have been treated for mental illness and depression, as have three of his maternal aunts." Appellant's Br. at 33.

est arguments in favor of mitigation. Bryant and Huff, in their efforts to spare McWee the death penalty, primarily focused on McWee's positive attributes and the basically good life that he led before he met George Wade Scott, his accomplice.[4] Huff told the jury that the family McWee grew up in "became a close family," J.A. 218, and that the family he started with his first wife was "a loving family," J.A. 219. Given Bryant and Huff's efforts to portray McWee's family history in a positive light, the PCR court reasonably applied *Strickland* in concluding that the failure to investigate further did not deprive McWee of his right to effective assistance of counsel.

In addition, it is highly unlikely that presenting the evidence of McWee's family history of mental illness, which McWee claims would have been gleaned from a more exhaustive investigation into his background, would have swayed the jury to sentence McWee to life imprisonment rather than death. This is not a case where counsel's failure to thoroughly investigate kept the jury completely in the dark as to McWee's alleged mental problems. Quite the contrary, the jury still heard expert testimony from Dr. Whitley, who opined that McWee was mentally ill, and McWee's attorneys also argued to the jury that McWee had "mental problems" and "depression" at the time he killed Perry. J.A. 215; 220-24. The jury heard ample testimony and arguments regarding McWee's alleged mental problems and sentenced him to death anyway. Learning about McWee's family history of mental illness would have added little in the way of new mitigating evidence, at the same time that it would have undermined counsel's efforts to portray McWee's family in a positive light. The PCR court reasonably applied *Strickland* in rejecting this claim because there was no "reasonable probability" that the outcome would have been different had Bryant and Huff conducted a more exhaustive investigation into McWee's background.

---

[4]Huff stated during his closing argument: "You've got to consider the other thirty-nine years of Jerry's life." J.A. 214. "But up until 1991, what you heard about Jerry was overwhelmingly all good. And I ask you not to throw away thirty-nine years of good for two weeks of senseless acts." J.A. 218. "Do you jury throw away thirty-nine years of goodness, caring, and hard work and serving others because of the crime that he's committed[?]" J.A. 228.

## C.

McWee finally claims that Bryant and Huff's performance fell below the standard articulated in *Strickland* because they failed to object to the admission into evidence of a psychiatric evaluation that McWee contends was taken in violation of his Fifth Amendment rights. The state PCR court rejected this claim on the merits, A. 3709-12, and we conclude that the state PCR court reasonably applied *Strickland* to this claim as well.

McWee's assertion that the evidence of his 1992 psychiatric evaluation at the William S. Hall Institute was inadmissible under the Fifth Amendment, as interpreted in *Estelle* v. *Smith*, 451 U.S. 454, 468-69 (1981), is without merit. In *Smith*, the Supreme Court held that, when a criminal defendant neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, the admission into evidence of the defendant's incriminatory statements to the psychiatrist during the evaluation, or the psychiatrist's opinion based on those statements, violates the Fifth Amendment privilege against self-incrimination, unless such statements were preceded by *Miranda* warnings. *Smith* is inapposite because McWee's attorneys requested the 1992 psychiatric evaluation. J.A. 356. *See Buchanan* v. *Kentucky*, 483 U.S. 402, 423 (1987); *Washington* v. *Murray*, 952 F.2d 1472, 1480 (4th Cir. 1991). In addition, McWee's attorneys themselves introduced evidence of McWee's psychiatric condition, in the form of Dr. Whitley's testimony regarding McWee's alleged mental problems, as a potential mitigating circumstance in their efforts to spare him the death penalty. Because the Constitution did not prohibit the admission of evidence from McWee's 1992 psychiatric evaluation, McWee cannot establish that Bryant and Huff's failure to move to suppress this evidence violated his Sixth Amendment right to counsel. Accordingly, the state PCR court's decision rejecting this claim cannot be deemed an unreasonable application of *Strickland*.

## *CONCLUSION*

The decisions of the South Carolina state courts that rejected McWee's claims were neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, nor were they based on an unrea-

sonable determination of the facts in light of the evidence presented in the state court proceeding. The district court correctly denied McWee's petition for habeas relief. McWee's motion for a certificate of appealability is hereby denied and his appeal is dismissed.

*SO ORDERED*