PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JAMES ADOLPH CAMPBELL,
            *Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina,
            *Respondent-Appellee.*

⎫
⎪
⎪
⎬   No. 04-2
⎪
⎪
⎭

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-00-680-1)

Argued: March 14, 2006

Decided: May 10, 2006

Before WILKINSON and MICHAEL, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Senior Judge Hamilton joined. Judge Michael wrote a separate opinion concurring in part and concurring in the judgment.

---

## COUNSEL

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant. Edwin William Welch, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Caro-

lina, for Appellee. **ON BRIEF:** William L. Livesay, Graham, North Carolina, for Appellant. Roy Cooper, North Carolina Attorney General, Raleigh, North Carolina, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Petitioner James Campbell was convicted by a North Carolina jury of first-degree murder, two counts of first-degree rape, kidnapping, armed robbery, and the burning of personal property. He was sentenced to death for the murder conviction. The state courts rejected both his arguments on direct appeal and his subsequent request for collateral relief. Campbell now brings a federal habeas petition under 28 U.S.C. § 2254 (2000), challenging his convictions and sentence. We have reviewed his claims with care and find them to be without merit. We therefore affirm the district court's dismissal of his petition.

### I.

On September 11, 1992, the body of Katherine Price was found in a field in Rowan County, North Carolina. Price had sustained twenty-two knife wounds to her neck. Five days later, North Carolina police officers arrested James Campbell for the murder. He confessed, and directed the police to various pieces of physical evidence, including the knife used to kill Price.

Campbell's confession to police was both extensive and specific. He admitted to the following: Campbell initially met Price on September 8, 1992. On this day, he was searching for a weapon to kill himself and his ex-girlfriend, Tina Cline, whom he had raped two days earlier. The next morning, Price saw Campbell walking on the street, and she offered him a ride. He accepted her invitation. While she was driving, he placed a knife to her throat and forced her to a secluded area. Campbell concluded that he would kill Price because he "couldn't leave the girl there and [he] couldn't take her with [him]." He asked her to have sex with him, and although she allegedly agreed, he explained that under the circumstances "you could call it rape."

After raping her twice, Campbell began choking Price in her car with such strength that one of his thumbs went numb. He then switched to strangling Price with a piece of her shirt. This, however, proved inadequate to kill Price, as her shirt ripped and she was still breathing. Campbell thus removed Price from the vehicle, placed her where her body was later discovered, and "took [his] knife and stabbed her in the side of her throat. [He] sat and watched the blood come out of her throat and she was still moaning and groaning. [He] stabbed her many more times because [he] wanted her to die." Price finally succumbed. Campbell then took Price's car and continued his search for a gun. In the evening, he visited Teresa Allman, a woman with whom he had carried on a relationship since July. They drove to where Campbell had left Price's car, and he set it ablaze. Later, in the presence of police, Campbell confessed that he killed Price because he had been unable to kill Cline.

On October 26, 1992, Campbell was indicted on several counts stemming from Price's murder. He was charged with first-degree murder, *see* N.C. Gen. Stat. § 14-17 (1986 & Supp. 1991), two counts of first-degree rape, *see id.* § 14-27.2(a)(2), first-degree kidnapping, *see id.* § 14-39, the burning of personal property, *see id.* § 14-66, and armed robbery, *see id.* § 14-87. A jury trial was held beginning in May 1993.

At trial, the state introduced substantial evidence of Campbell's guilt, in addition to his confession to police. A doctor testified that stab wounds to Price's neck caused her death, and that blood found on Price matched Campbell's blood and her own. Campbell's brother-in-law testified that Campbell told him both that he killed an innocent person, and that he needed to dispose of his knife and tennis shoes. Teresa Allman averred that she was with Campbell when he burned a car, and that, after he was arrested, he admitted to her that he had killed a girl. Campbell's former girlfriend, Tina Cline, asserted that three days before Campbell killed Price, he had forced Cline to drive to a wooded area and had raped her there. Cline further testified that she had not gone to the police out of fear of Campbell. Finally, three other women testified about prior crimes that Campbell had committed against them. He had kidnapped one of them, and raped the other two.

Campbell testified at trial that he did not murder Price. He claimed that he had previously confessed to killing her to protect Allman, who actually committed the murder. According to Campbell, on the day of the murder he drove with Price to an area where he often took Allman, and the two had consensual sex. Allman subsequently arrived on the scene, saw the two of them together, and killed Price in a jealous rage. Campbell further declared that he had neither raped nor kidnapped the three women who testified for the prosecution about Campbell's prior crimes.

On June 29, 1993, the jury convicted Campbell on all counts. A sentencing hearing was held from June 29 to July 8. At the hearing, six witnesses testified for Campbell. Campbell and his two sisters testified, inter alia, about his abusive childhood. A former employer discussed Campbell's good work habits, and Allman described his capacity to love. Finally, Dr. Robert Rollins opined extensively on Campbell's mental state. The prosecution, in addition to the evidence presented at the guilt phase, introduced the testimony of two more women who had been accosted by Campbell. Campbell had put scissors to the throat of one, and had taken the other to a field, tied her to a tree, and abandoned her.

The jury recommended that Campbell be sentenced to death. It found four aggravating circumstances: that Campbell was previously convicted of four felonies involving the use or threat of violence, *see* N.C. Gen. Stat. § 15A-2000(e)(3) (1988), that he murdered Price to avoid arrest, *see id.* § 15A-2000(e)(4), that the murder was committed while Campbell was engaged in rape and kidnapping, *see id.* § 15A-2000(e)(5), and that the murder "was especially heinous, atrocious, or cruel," *id.* § 15A-2000(e)(9).

At least one juror determined that a statutory mitigating circumstance was present, namely, that the murder was committed while Campbell "was under the influence of mental or emotional disturbance." *Id.* § 15A-2000(f)(2). Also, at least one juror found two nonstatutory mitigating circumstances: that Campbell was "emotionally neglected and ha[d] chronic feelings of deprivation, inadequacy and anger," and that Campbell had "a history of substance abuse which began at a very early age as a consequence of a lack of supervision and a lack of family structure." All the jurors concluded, however,

that the aggravating circumstances outweighed any mitigating ones, and were sufficiently substantial to call for the death penalty.

The trial court accepted the jury's recommendation, and sentenced Campbell to death for first-degree murder. It also sentenced him to life imprisonment for each of the two counts of rape, thirty years for kidnapping, forty years for armed robbery, and ten years for the burning of personal property. The Supreme Court of North Carolina affirmed Campbell's convictions and sentences on direct appeal. *See State v. Campbell*, 460 S.E.2d 144, 163 (N.C. 1995), *cert. denied*, 516 U.S. 1128 (1996).

On December 18, 1996, Campbell filed a motion for appropriate relief in North Carolina Superior Court (the MAR court). An evidentiary hearing was held over six days in August 1997. On March 22, 1999, the MAR court issued a written order rejecting Campbell's motion, and the Supreme Court of North Carolina denied certiorari. *See State v. Campbell*, 543 S.E.2d 137 (N.C. 2000).

On July 19, 2000, Campbell filed a petition for a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254 (2000). A magistrate judge recommended that the district court reject all of Campbell's claims. The district court accepted this recommendation, and dismissed Campbell's petition. Campbell appealed, and we granted a certificate of appealability. *See id.* § 2253(c). He now makes six arguments, challenging aspects of both the guilt and sentencing phases of his trial. We will examine each of his claims in turn, but first set forth the appropriate standard of review.

II.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), we review state court decisions under "a highly deferential standard." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (per curiam). If a state court has adjudicated a petitioner's claim on the merits, we can only grant habeas relief in two circumstances.

First, we can grant the writ if the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Clearly established federal law consists of the Supreme Court's holdings, not its dicta, at the time of the relevant state decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth" by the Supreme Court or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-06. Alternatively, a state court's adjudication involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [particular] case." *Id.* at 413. That the state decision was incorrect or erroneous is insufficient to warrant relief; it must be objectively unreasonable. *See Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). "In assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether its decision was well reasoned." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (internal quotation marks and alterations omitted).

Second, we can authorize relief if the state adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Thus we presume the [state] court's factual findings to be sound unless [petitioner] rebuts the 'presumption of correctness by clear and convincing evidence.'" *Miller-El v. Dretke*, 125 S. Ct. 2317, 2325 (2005) (quoting 28 U.S.C. § 2254(e)(1)). Keeping in mind these deferential standards, we turn to Campbell's substantive claims.

### III.

Campbell first argues that the state failed to provide him with evidence favorable to him, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

### A.

Campbell contends that the state did not furnish him with witness statements that would have supported his theory that Teresa Allman

committed Price's murder. First, a police report shows that Allman gave inconsistent statements to law enforcement — she did not initially tell them about her involvement in burning Price's car. It is Campbell's position that this report would have helped impeach Allman's testimony. Second, Price's grandmother indicated that Price might have wanted to leave her boyfriend, and her boyfriend gave a prior statement that was not identical to his trial testimony. Campbell believes that this evidence bolsters his theory that his sexual intercourse with Price was consensual. Third, two individuals told police that they sometimes noticed vehicles driving near the location of Price's murder, which, Campbell claims, shows that the area was well-traveled and that Allman may have gone there in search of him. Fourth, Campbell alleges the state did not submit to the defense a statement by Ada Teal, one of the women who testified that Campbell had previously raped her. Campbell has not pointed us to a copy of Teal's prior statement in the record. The MAR court rejected Campbell's *Brady* claim on the merits.

## B.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Both impeachment evidence and exculpatory evidence "fall[ ] within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted). When reviewing for materiality, courts examine the cumulative impact of all the undisclosed evidence, and do not consider evidence item by item. *Id.* at 436.

Even if we assume the evidence Campbell has now presented was actually suppressed by the state, it is not an unreasonable application of *Brady* to conclude that Campbell has failed to prove materiality. Considering the collective impact of the evidence, it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. To begin with, there is extensive evidence of Campbell's guilt. He gave

a lengthy and highly detailed confession to the police prior to chang-
ing his story and implicating Allman. He also confessed to several
other people, including his brother-in-law, his ex-girlfriend, and All-
man. And he guided the police to physical evidence of the crime,
including the knife used to kill Price. *See Campbell*, 460 S.E.2d at
148-49.

In addition, the allegedly undisclosed evidence would have pro-
vided little, if any, independent support to Campbell's defense. The
police report showing that Allman gave inconsistent statements had
little impeachment value, because Allman admitted on the stand that
she did not initially tell police the whole truth. Furthermore, the state-
ments indicating Price might have wanted to break things off with her
boyfriend or that cars sometimes traveled near the murder scene were
at most tangentially relevant. The jury would have had to pile infer-
ence upon inference for this evidence to make Campbell's theory of
the case — that Allman committed the murder — more credible.
Finally, Campbell has not described the content of Teal's prior state-
ment, so we can only speculate whether it had any impeachment
value. Even if it did, three other women also described how Campbell
had previously assaulted them.[1]

In sum, the evidence of Campbell's guilt was strong, and the evi-
dence allegedly withheld would have aided the defense only mini-
mally, if at all. It is, to say the least, not unreasonable to conclude that
the allegedly undisclosed evidence falls short of raising a reasonable
probability that the outcome of the trial would have been different.
*See Kyles*, 514 U.S. at 433-34.

---

[1]Campbell also argues that the state failed to give the defense a taped
statement by his brother-in-law suggesting that Campbell was suicidal,
"crazy," and "sick." He believes these comments would have led his
counsel to put on a diminished capacity defense instead of the defense
that Allman committed the murder. As the MAR court found, this tape
was given to the defense at trial, and Campbell's lawyers had time to
review it. It was thus not suppressed by the state. And even if it was,
there is little likelihood that Campbell's counsel would have decided to
put on a diminished capacity defense as a result of his brother-in-law's
conversation with police.

IV.

Campbell next contends that his convictions should be overturned because Richard Locklear, one of his trial lawyers, had a conflict of interest that violated his Sixth Amendment rights.

A.

Campbell's conflict claim concerns Locklear's relationship with James Dooley, his law partner at the time of Campbell's trial. At trial, Ada Teal testified that Campbell kidnapped and raped her in June 1982. Teal reported the incident to the police, and Campbell was criminally charged. Dooley was an assistant district attorney in 1982, and he signed the document dismissing the charges against Campbell. Campbell now believes that Locklear should have called Dooley as a witness at his trial. According to Campbell, Dooley would have testified that Teal was reluctant to move forward with the case, which could have bolstered the defense's theory that Teal had consensual sex with Campbell. Campbell alleges that Locklear refused to call Dooley because of their relationship as law partners.

This potential conflict was addressed at Campbell's trial. Locklear discussed the matter with Campbell, and they concluded that any conflict would not adversely affect Locklear's performance. As a cautionary matter, however, Locklear filed a motion to withdraw with the trial court, and a hearing was held. At the hearing, the state informed the court that it did not plan to call Dooley as a witness. Campbell then explained that he knew of the potential conflict, and had no problem keeping Locklear as his counsel. The court thus allowed Locklear to remain Campbell's attorney. Locklear later testified before the MAR court that he thought that the only party that would have been adversely affected by his relationship with Dooley was the state, because it might have been reluctant to call Dooley knowing he was Locklear's law partner.

The MAR court found that Campbell's conflict claim was procedurally defaulted. The court also concluded that it failed on the merits, because, inter alia, Campbell did not demonstrate that the alleged conflict "adversely affected the adequacy of his representation."

B.

Assuming Campbell did not procedurally default this claim, the MAR court's adjudication on the merits was not an unreasonable application of Supreme Court precedent. "[I]t is clearly established that the [Sixth Amendment] right to effective assistance includes the right to representation free from conflicts of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980)). To establish a violation of this right, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348. Unlike those ineffective assistance claims governed by *Strickland v. Washington*, 466 U.S. 668, 687 (1984), prejudice is presumed if a defendant meets the *Sullivan* test, *id.* at 692.

Even if it is clearly established that *Sullivan* applies to the conflict presented here, *see Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002), Campbell has not shown that the conflict "adversely affected [Locklear's] performance." *Sullivan*, 446 U.S. at 348. It is entirely reasonable to conclude that Locklear declined to call Dooley to testify because he felt that it was in Campbell's best interest to keep Dooley off the stand, not because Dooley was his law partner. To be sure, Dooley had suggested that it was his recollection — looking back over ten years — that Teal was reluctant to move forward with the case against Campbell. But the document Dooley signed actually dismissing the charges indicates that they were dismissed because Campbell was serving a thirty-year sentence in South Carolina. It made no mention of Teal's alleged hesitancy to prosecute. Dooley further testified before the MAR court that he believed the case was dismissed mainly because of Campbell's lengthy prison time. He also asserted that he did not remember ever talking with Teal, that he may have only learned about the facts of her case from police officers, and that he had no written records documenting her reluctance. Calling Dooley to testify would thus inevitably have highlighted Campbell's extended term of incarceration, and drawn even more attention to damaging conduct for which Campbell was not being tried. Locklear could conclude that these negative factors far outweighed whatever aid Dooley's equivocal testimony might have offered.

We also note that Locklear proceeded with care in dealing with this potential conflict. He first discussed it with Campbell, and went so far as to bring it to the trial judge's attention so that a hearing could be held on the matter. Campbell was repeatedly warned of the potential conflict, and he expressly agreed to retain Locklear. Under these circumstances, it is hardly unreasonable to conclude that Locklear's relationship with Dooley did not adversely affect his performance. *See Mickens*, 535 U.S. at 168; *Sullivan*, 446 U.S. at 348.

V.

Campbell next asserts that his trial counsel, Locklear and Robert Davis, provided ineffective assistance at the guilt phase of his trial.

A.

At trial, Campbell's defense was that Teresa Allman murdered Price. Campbell now contends that his trial counsel failed to properly investigate and instruct him on the possibility of a "diminished capacity defense" — one in which a defendant claims he does not have "the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation." *State v. Poindexter*, 608 S.E.2d 761, 764 (N.C. 2005) (internal quotation marks omitted). Campbell posits that this would have been a superior trial strategy.

To support this claim, Campbell had Dr. John Warren, a licensed psychologist, testify before the MAR court. Dr. Warren indicated that Campbell may not have had the specific intent necessary to commit first-degree murder. In addition, Robert Pelley, a family counselor, asserted that Campbell had an "impaired ability to understand social norms and the laws" when he murdered Price. Two defense lawyers also testified that a diminished capacity defense fit the facts of Campbell's case. However, Dr. Robert Rollins, Campbell's court-appointed psychiatrist who testified at sentencing, opined before the MAR court that Campbell did not have a diminished capacity at the time of the murder.

The MAR court rejected Campbell's claim. It found that Campbell directed his lawyers to pursue the theory that Allman murdered Price,

and that they acted reasonably in following his instructions. It also determined that Davis and Locklear "conducted a reasonable investigation prior to trial and discussed their trial strategy with defendant." It thus held that they did not act deficiently in failing to advise Campbell about the possibility of a diminished capacity defense. Finally, the MAR court concluded that the lawyers' performance, even if deficient, did not establish prejudice.

B.

To prove ineffective assistance of counsel, a petitioner must satisfy the familiar requirements of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The petitioner must initially prove that his counsel's performance was objectively unreasonable. *Id.* at 687-88. In undertaking this inquiry, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

> Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). The petitioner must also demonstrate that prejudice resulted from counsel's errors. To establish prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We do not believe that the MAR court unreasonably applied *Strickland* here.

1.

With regard to *Strickland*'s first prong, the MAR court could reasonably conclude that trial counsel's strategic decision to argue that Campbell did not commit the murder — instead of pursuing a dimin-

ished capacity defense — was objectively reasonable. This is so, both because counsel rationally pursued a trial strategy that was the best option in their professional judgment, and because Campbell strongly asserted that he wanted to employ this strategy.

As the MAR court found, Davis began initial inquiries into mental health issues soon after taking Campbell's case. He conducted legal research on a diminished capacity defense, and investigated the possibility of retaining a psychologist. Davis continued researching mental health issues after meeting with Campbell a second time, and specifically considered the possibility of advanced neurological testing. Two months later, however, Campbell emphatically retracted his prior confessions, indicating that he had made them in order to protect Allman, the real murderer. At this point, his counsel understandably switched gears, and did not broach the possibility of a diminished capacity defense with Campbell. Counsel believed that Campbell's explanation for confessing was plausible, because Campbell enjoyed a close relationship with Allman. They also felt that the defense offered a reasonable chance of success.[2]

This new strategy further eliminated potential problems with a defense premised on Campbell's mental incapacity. Davis testified before the MAR court that he had previously considered using diminished capacity defenses in Rowan County, but that local juries had "not been quick to recognize" such a defense. Similarly, Locklear testified that raising a diminished capacity defense in front of Rowan County jurors "would be tantamount to sticking the needle in [Campbell's] arm," and that these jurors probably would find no "better reason to put him to death."

---

[2]Campbell suggests that his lawyers did not meet with him enough prior to trial, and that this made their performance objectively unreasonable. But we have held that "there is no established minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel." *Moody v. Polk*, 408 F.3d 141, 148 (4th Cir. 2005) (internal quotation marks omitted). Under these circumstances, we cannot conclude that the fact that Campbell's counsel only met with him five times before trial made them ineffective.

These concerns with a diminished capacity defense did not reflect the hesitancies of untested counsel, as Davis and Locklear were both experienced North Carolina lawyers. Davis had practiced law since 1950. He had been a prosecutor and a judge, and had substantial trial experience defending all types of felonies, including murder. Locklear had practiced since 1984, and had appreciable experience in criminal matters. We are loathe to second-guess the state courts and seasoned counsel on the strategies most likely to succeed in front of local juries. On such a matter, their expertise exceeds our own.

We further cannot fault counsel for heeding petitioner's protestations of his own innocence. To have pursued a different tack in the face of those assertions would have presented problems of its own. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. The trial strategy selected by Davis and Locklear was, significantly, enthusiastically endorsed by Campbell himself. Campbell strongly asserted that he did not commit Price's murder, and indicated to his lawyers that he wanted to pursue this line of defense and testify at trial accordingly.[3] At the beginning of the trial, he signed a stipulation that expressly authorized his attorneys to pursue this strategy. And during the trial, when his lawyers suggested that the jury be given the option of finding him guilty of a lesser included offense such as manslaughter, he adamantly rejected the idea and proffered a handwritten statement directing them to have him tried only on first-degree murder.

Attorneys must not be lightly judged deficient when they follow their client's clear instructions. Doing so would place defense counsel in a Catch-22 should the defendant be convicted. *See Lovitt v. True*, 403 F.3d 171, 181 (4th Cir. 2005); *Frye v. Lee*, 235 F.3d 897, 906-07 (4th Cir. 2000). In this case, for example, if trial counsel had refused to follow Campbell's instructions, employed a diminished capacity

---

[3]Campbell claims that his decision to testify was not fully informed. But the MAR court found that it "was made after extensive discussion with trial counsel, which included a discussion of the 'pros and cons' of taking the witness stand." We are bound by this factual finding since Campbell has not rebutted it by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

defense, and kept him off the stand, Campbell could argue they were ineffective for not heeding his directions and for pursuing a doomed course. But because counsel instead presented the desired defense and had him testify, they now must face the claim that this too was unreasonable. "We refuse to place defense lawyers in this position," *Lovitt*, 403 F.3d at 181, and thus "[t]he best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case," *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991).

2.

It was similarly not unreasonable for the MAR court to conclude that Campbell was in no way prejudiced by the failure of his attorneys to put on a diminished capacity defense. By utilizing a diminished capacity defense under North Carolina law, a defendant calls into question his "ability to form the specific intent to kill required for a first-degree murder conviction on the basis of premeditation and deliberation." *Poindexter*, 608 S.E.2d at 764.

The evidence of Campbell's premeditation and deliberation was strong. His own previous confessions — which would have lain virtually uncontradicted before the jury if he utilized a diminished capacity defense — plainly illustrate this fact. Moreover, Campbell's actions before the murder would have undercut any diminished capacity defense. Campbell explained that he first met Price while he was looking for a gun to kill Cline, his ex-girlfriend, and that he murdered Price because he could not kill Cline. After he kidnapped Price and forced her to the crime scene, Campbell "determined that he would have to kill her because 'he couldn't leave the girl there and he couldn't take her with him.'" *Campbell*, 460 S.E.2d at 149. And after he raped her the first time, Campbell "considered tying her up and leaving her, but [he] knew she would call the police." Thus, well before he killed Price, Campbell was both planning the murder of another individual and mulling over in his mind what to do with Price.

Campbell's conduct during and after the commission of the murder would have further demonstrated to the jury that he had the requisite intent. He confessed that he initially attempted to strangle Price in her car, but this proved ineffective. He thus carried her out of the car and

laid her on the ground. He then cut her throat with his knife. But this too did not kill her, so he "stabbed her many more times because [he] wanted her to die." The callous and incremental way that Campbell carried out the murder demonstrated that it did not happen in a matter of seconds, but took some time to complete, affording him opportunities to continually reconsider his course of action. After the murder, he attempted to dispose of various pieces of physical evidence, divulging to his brother-in-law that he needed to discard his knife and tennis shoes. He also torched Price's car because he knew he "had to get rid of [it]." A diminished capacity defense would thus hardly have saved Campbell from his calculated decisionmaking.

Additionally, the evidence that Campbell presented to the MAR court of his diminished capacity was far from unequivocal. Although Dr. Warren opined Campbell did have a diminished capacity, Dr. Rollins, Campbell's court-appointed expert, expressly disagreed with that assessment. Since Campbell has "no constitutional right to insist on the appointment of any particular expert," *Walton v. Angelone*, 321 F.3d 442, 464 (4th Cir. 2003), he could not have replaced Dr. Rollins at trial simply because he disagreed with his opinion. Indeed, Campbell's counsel had previously attempted to substitute Dr. Rollins with another expert, but the trial court refused to grant the request. In all events, ample evidence demonstrated Campbell's intent, and the MAR court reasonably held that the questionable trial strategy of a diminished capacity defense would not have led to a different outcome in his case.

## VI.

Campbell next claims that his lawyers were ineffective at sentencing because they failed to adequately present mitigating evidence concerning his life history and mental health.

## A.

Six witnesses testified for Campbell at his sentencing. Campbell's sister and half-sister, Sherry Harrison and Dawn Beaver, discussed Campbell's life history. They explained, inter alia, that their mother drank alcohol excessively, that their mother often fought with their various stepfathers, that Campbell began using drugs at an early age,

and that he loved and cared for his sisters. Campbell also testified about his abusive and violence-plagued background. One of Campbell's former employers asserted that Campbell was a good employee, and Allman testified about Campbell's love for her. Finally, Dr. Rollins opined that Campbell suffered from two mental disorders — adjustment disorder and mixed personality disorder — which, along with extensive marijuana use, impaired his ability to adjust to appropriate standards of behavior.

At the evidentiary hearing before the MAR court, Campbell proffered additional mitigation evidence that he alleges should have been presented to the sentencing jury. His two sisters testified about his childhood in greater detail, and this time his mother testified as well. Dr. Warren observed that Campbell had four mental disorders — the two that Dr. Rollins had indicated at sentencing plus attention deficit disorder and cannabis dependence — that impaired his ability to form specific intent. Robert Pelley, a family counselor, likewise opined that Campbell might have been impaired at the time of the crime.

The MAR court concluded that defense counsel were not ineffective at sentencing. It found that counsel discussed with Campbell the importance of presenting to the jury his dysfunctional childhood, and endeavored to call as many family members as possible. It also determined that while it was unclear how much time his lawyers talked with Dr. Rollins, they were not deficient in preparing him to testify, as he clearly explained his opinions. Finally, it held that Campbell could not prove prejudice.

## B.

Trial counsel have a duty to reasonably investigate and present mitigation evidence at sentencing. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000); *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003). At the same time, however, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant." *Wiggins*, 539 U.S. at 533. In determining prejudice from a failure to present mitigation evidence, "we reweigh the evidence in aggravation against the totality of available

mitigating evidence." *Id.* at 534; *see also Lovitt*, 403 F.3d at 181
(same). We will address each prong of *Strickland* in turn.

1.

The MAR court could reasonably conclude that Davis and Lock-
lear adequately investigated and set forth evidence of Campbell's
background and mental health. First, trial counsel did not act defi-
ciently in presenting Campbell's life history. As the MAR court
found, they discussed with Campbell the importance of presenting
evidence of his problematic childhood. Accordingly, both of his sis-
ters described his abusive upbringing to the jury, and Campbell also
testified in detail about his past. Campbell criticizes his counsel for
not sufficiently preparing witnesses to testify and for failing to elicit
greater details, but the evidence he presented to the MAR court was
largely redundant. And although Campbell's mother did not testify at
sentencing, her testimony before the MAR court added only mini-
mally to what had previously been aired by Campbell and his sisters.
Trial counsel might also have reasonably refrained from calling
Campbell's mother out of concern with her credibility once Campbell
and his sisters had discussed their dysfunctional childhood.

Davis and Locklear, furthermore, could not provide the jury with
additional evidence of Campbell's background in large part due to
Campbell's own strong insistence that they not do so. Campbell was,
for example, adamant that counsel not call his mother, even after they
advised him of the need to have family members testify. And when
Davis questioned one of his sisters at sentencing about an incident in
which Campbell's step-father violently assaulted his mother, Camp-
bell screamed at his sister to get off the stand. Campbell's lawyers
were thus understandably hesitant to present more details of his child-
hood, and risk further outbursts. They acted reasonably when they fol-
lowed their client's firm instructions in the trying situation in which
they found themselves. *See Frye*, 235 F.3d at 905; *see also Bunch*,
949 F.2d at 1363 ("It is becoming all too commonplace to charge
even diligent counsel in the midst of difficult circumstances with the
adverse outcome in a capital case.").

Second, trial counsel did not act deficiently in presenting evidence
on Campbell's mental health. They were able to obtain the services

of Dr. Rollins, who testified about Campbell's mental disorders. Campbell criticizes his lawyers for not providing Dr. Rollins with enough information, and argues that with such additional information Dr. Rollins might have persuaded the jury that Campbell was impaired at the time of the crime. *See* N.C. Gen. Stat. § 15A-2000(f)(6) (mitigating circumstance that defendant's ability to appreciate criminality of his conduct was impaired). But Rollins did specifically assert at sentencing that Campbell suffered from mental disorders that impaired his ability to control his behavior. And although Dr. Rollins had a limited window to examine Campbell before he testified, he acknowledged at the hearing before the MAR court that he had sufficient contact with Campbell to give a reasoned professional judgment on Campbell's mental health. Dr. Rollins also indicated both at sentencing and at the evidentiary hearing that his opinion was based in part on information Campbell's attorneys provided him. There is thus insufficient evidence in the record for us to conclude that counsel improperly prepared or examined Dr. Rollins.

Campbell contends his counsel's performance is similar to the conduct of counsel in *Wiggins* and *Williams*. But the facts of those cases are far afield from what occurred here. In *Williams*, for example, counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [the petitioner's] nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at 395. And in *Wiggins*, "counsel introduced no evidence of [the petitioner's] life history." 539 U.S. at 515. In this case, Davis and Locklear knew of the importance of mitigating evidence and presented a significant amount of it, notwithstanding Campbell's reluctance to do so. Indeed, counsel's diligent efforts successfully persuaded members of the jury that three mitigating circumstances were present. The MAR court reasonably found the performance of Campbell's attorneys to pass muster under *Strickland*, especially considering the difficult circumstances in which counsel operated.

2.

Even if counsel's performance was objectively unreasonable, Campbell has failed to establish prejudice, because it is not reasonably probable that "the totality of available mitigating evidence"

would have led the jury to spare Campbell's life. *Wiggins*, 539 U.S. at 534. Most importantly, the jury found that grave aggravating circumstances attended Price's murder. Campbell had been convicted of four prior felonies involving the threat or use of violence. *See* N.C. Gen. Stat. § 15A-2000(e)(3). In fact, the jury heard testimony from *six* different women who described how Campbell had either raped or assaulted them in the years prior to his rape and murder of Price. Campbell also killed Price after he had both kidnapped her at knife point and raped her two times, *see id.* § 15A-2000(e)(5), and did so for the purpose of preventing his arrest, *see id.* § 15A-2000(e)(4). The jury had a sound basis to conclude that Campbell's crime "was especially heinous, atrocious, or cruel," *id.* § 15A-2000(e)(9).

In addition, the evidence Campbell argues should have been presented at sentencing was largely cumulative. *See Moody v. Polk*, 408 F.3d 141, 154 (4th Cir. 2005) (petitioner failed to establish prejudice where, inter alia, mitigation evidence presented at state evidentiary hearing was mostly cumulative with that submitted at trial); *McHone v. Polk*, 392 F.3d 691, 709-10 (4th Cir. 2004) (same); *Byram*, 339 F.3d at 211 (same). At the MAR proceeding, Campbell's sisters and mother testified about, inter alia, his violent childhood, their mother's drinking problems, and his marijuana abuse. Although they described some specific instances not detailed at sentencing — for example, that Campbell's mother once threatened to cut his tongue out with a knife or that when they were young Campbell pulled his sister out of a lake — these episodes would have added only marginally to the sympathetic portrait his counsel were attempting to portray.

Similarly, neither Dr. Warren's opinion nor Robert Pelley's assessment would have added much to what Dr. Rollins expressed at sentencing. Dr. Warren and Dr. Rollins did not differ to a significant extent on their diagnoses of Campbell's mental disorders. The main distinction was Dr. Warren's opinion that Campbell had attention deficit disorder, but this would not have added in any meaningful way to Campbell's mitigation evidence. And although Dr. Warren and Pelley indicated that Campbell was impaired at the time of the crime, Dr. Rollins did opine at sentencing that Campbell's mental disorders impaired his ability to adjust his behavior to appropriate standards. In conclusion, taking into account both the severe aggravating circumstances in this case and the limited additional evidence presented to

the MAR court, we cannot conclude that the MAR court unreasonably applied *Strickland* in holding that Campbell did not establish prejudice.

## VII.

Campbell next argues that the trial court failed to provide him with adequate psychiatric assistance, in violation of *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

## A.

In February 2003, Campbell filed a motion requesting that the trial court appoint him a psychiatric expert. The court did not believe Campbell had made the requisite showing to have a psychiatrist appointed under *Ake*, but nonetheless had Dr. Rollins evaluate Campbell to determine his competency to stand trial. Dr. Rollins conducted a neutral evaluation, in which anything Campbell disclosed was not confidential, and found Campbell competent. In April, Campbell renewed his motion for an expert, and the trial court appointed Dr. Rollins to assist Campbell in any relevant matters pertaining to the guilt or penalty stages of the trial. Campbell was, however, reluctant to work with Dr. Rollins because of Dr. Rollins's prior service as a neutral examiner. Dr. Rollins suggested that a different expert be appointed, and Campbell filed another motion for expert assistance in May. The court denied the motion. It explained that Campbell never actually established that he needed an expert, and that Campbell did not have the right to the expert of his choice, *see, e.g.*, *Walton*, 321 F.3d at 464. Campbell cooperated once he realized that Dr. Rollins was the only expert appointed to assist his defense.

Since Campbell's defense at trial was based on his theory that Allman committed the murder, Dr. Rollins only testified at sentencing. As discussed above, he gave an opinion on Campbell's mental state. On direct appeal, the Supreme Court of North Carolina held that Dr. Rollins adequately assisted Campbell, because his testimony was based on sufficient information and provided significant support for the three mitigating circumstances found by at least one member of the jury. *See Campbell*, 460 S.E.2d at 150-51.

### B.

"[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. Campbell contends that the state court unreasonably applied *Ake* both because Dr. Rollins did not provide adequate expert assistance and because he was a "neutral" expert who assisted both parties. We disagree.

As an initial matter, it is far from clear that Campbell even made the showing required for the appointment of a psychiatric expert. *See Page v. Lee*, 337 F.3d 411, 415-16 (4th Cir. 2003) (defendant must illustrate: "(1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case") (internal quotation marks omitted). At the initial hearing, Campbell appeared to offer "little more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. 320, 323-24 n.1 (1985); *see also Ake*, 470 U.S. at 82-83 (defendant must make "threshold showing" for psychiatric expert). Indeed, the trial court expressly indicated throughout that Campbell never demonstrated a need for an expert, and only appointed Dr. Rollins out of an abundance of caution.

Even assuming Campbell made the necessary showing, his claim is still without merit. He first alleges that Dr. Rollins did not provide adequate assistance. But we have repeatedly held that a defendant has no right to the effective assistance of expert witnesses. *See Fisher v. Angelone*, 163 F.3d 835, 853 (4th Cir. 1998); *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998); *Pruett v. Thompson*, 996 F.2d 1560, 1573 n.12 (4th Cir. 1993). And we have refused to read into *Ake* "'a malpractice standard for a court-appointed psychiatrist's performance.'" *Joseph v. Angelone*, 184 F.3d 320, 327 (4th Cir. 1999) (quoting *Wilson*, 155 F.3d at 401). Such an extension "would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate." *Wilson*, 155 F.3d at 401. *Ake*'s primary concern is thus only with ensuring that a

defendant has access to a psychiatric expert. *See Joseph*, 184 F.3d at 327. Since Dr. Rollins was a qualified expert to whom Campbell had ready access, it was reasonable to conclude that the dictates of *Ake* were met.

We also note that Dr. Rollins did in fact provide Campbell with competent assistance. Dr. Rollins had been board-certified in psychiatry since 1963. In forming his opinion on Campbell's mental health, he interviewed Campbell on four separate occasions, obtained information from Campbell's attorneys, reviewed a psychological evaluation of Campbell from 1989, interviewed Campbell's sister, examined reports of interviews with his mother and sisters, and read other investigative materials. With all this information, he unequivocally acknowledged that he was able "to form a reasoned professional judgment and opinion concerning [Campbell's] mental state." While Campbell criticizes Dr. Rollins for not conducting various psychological tests, Dr. Rollins explained that he did not think such testing was necessary, and that he could have arranged to have Campbell tested if he thought otherwise. Finally, though *Ake* is not concerned with "guaranteeing a particular substantive result," *Wilson*, 155 F.3d at 401, Dr. Rollins's opinion clearly bolstered Campbell's case. His testimony provided "the sole supporting evidence" for the statutory mitigating circumstance found by the jury, and supported the two non-statutory mitigating circumstances as well. *Campbell*, 460 S.E.2d at 151.

Campbell finally contends that the trial court violated *Ake* because Dr. Rollins was a neutral expert whose reports were available to both parties.[4] We cannot agree. Even if *Ake* somehow required the court to appoint a non-neutral expert, Dr. Rollins satisfied this requirement.[5]

---

[4]Campbell also alleges in a single footnote in his brief that there was error because the prosecution's trial materials contained some of Dr. Rollins's research. The MAR court found that Campbell presented an insufficient factual basis to support this allegation, and we do not find this characterization of the evidence to be unreasonable. *See* 28 U.S.C. § 2254(d)(2).

[5]Our concurring brother disagrees with the majority's analysis on this point "to the extent that it suggests *Ake* might not require a court to appoint a non-neutral expert." Concurring Op. at 28. As this very quotation recognizes, the majority has found it unnecessary to pass on this question. Indeed, we have noted that the trial court here expressly appointed Dr. Rollins to assist the defense.

The trial court appointed him "to assist the defendant in the evaluation, preparation and presentation of the defense in this case." That Dr. Rollins originally provided the court with a neutral opinion that Campbell was competent to stand trial did not disqualify him from later serving as the defense's expert. *Compare Wilson*, 155 F.3d at 400 (noting that defendant's court-appointed expert had reported that defendant was competent to stand trial). Campbell's *Ake* claim thus fails.

## VIII.

Campbell lastly contends that his capital sentence should be overturned because the trial court did not instruct the jury, pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994), that Campbell was ineligible for parole.

## A.

During sentencing deliberations, the jury asked the court the following: "Life sentence, what is minimum time? What is least time served? Could [Campbell] be released early because of our overcrowded prisons? And what about good behavior?" The trial court responded without objection from Campbell: "This is just not of your concern. You're to take the instructions that I gave you in this case, and you're not to concern yourself with anything else. That's not — that's just not for your concern." Campbell did not request an instruction that he was ineligible for parole, but believes the trial court should have given one in response to the jury's question.

On direct appeal, the Supreme Court of North Carolina rejected Campbell's contention that it was error under *Simmons* not to provide a parole ineligibility instruction. It held that such an instruction was not required, because Campbell would have been legally eligible for parole after twenty years on his first-degree murder conviction. *See Campbell*, 460 S.E.2d at 159-60.

## B.

*Simmons* held that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to

death is life imprisonment *without possibility of parole*, due process entitles the defendant to inform the capital sentencing jury — by either argument or instruction — that he is parole ineligible." 512 U.S. at 178 (O'Connor, J., concurring) (emphasis added); *see also Wilson*, 155 F.3d at 408 (noting that Justice O'Connor's concurring opinion expressed the "essential holding" of *Simmons*). The state court's decision here was not contrary to or an unreasonable application of *Simmons*. We have repeatedly declined to extend *Simmons* to cases where the defendant would be parole eligible if sentenced to life. *See, e.g.*, *McWee v. Weldon*, 283 F.3d 179, 184 (4th Cir. 2002); *Bacon v. Lee*, 225 F.3d 470, 486 (4th Cir. 2000); *Wilson*, 155 F.3d at 408. On each of Campbell's life sentences, whether for murder or for rape, he would have been eligible for parole after twenty years. *See also Campbell*, 460 S.E.2d at 159 (explaining that "[u]nder the statutes in effect when the murder was committed," Campbell "could not have been sentenced to life without parole"). If, for example, the jury had recommended Campbell for life imprisonment for murder, he would have been eligible for parole on that conviction under North Carolina law. *See* N.C. Gen. Stat. § 15A-1371(a1) (1988 & Supp. 1991). As such, he was not entitled to a *Simmons* instruction.

Campbell nonetheless contends that even if he was not parole ineligible *as a matter of law*, he was parole ineligible as a *functional matter*. Specifically, Campbell argues that had he received a life sentence for murder, he would not have been parole eligible for eighty years, taking into account the substantial consecutive sentences he would have likely received for his five other convictions. This would have been well past Campbell's reasonable life expectancy, because he was thirty-two years old at the time of trial. Campbell thus suggests that *Simmons* requires courts to engage in a practical, not a legal, approach for determining a defendant's parole ineligibility. Under such a practical approach, Campbell argues there is simply no way that he would even be alive at the time he became eligible for parole.

The problem for Campbell is that "*Simmons* has been narrowly construed, both by the Supreme Court and this Court." *United States v. Stitt*, 250 F.3d 878, 889 (4th Cir. 2001). Indeed, the Supreme Court has already rejected the invitation to employ a "functional approach" for determining parole ineligibility. *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000) (plurality opinion). In *Ramdass*, a plurality of the

Court explained that "*Simmons* applies only to instances where, *as a legal matter*, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Id.* (emphasis added). Justice O'Connor's separate concurrence likewise denied the petitioner's claim by concluding that he was "eligible for parole *under state law* at the time of his sentencing."[6] *Id.* at 181 (emphasis added). We too have "decline[d] to adopt a 'functional approach'" for assessing parole ineligibility. *Stitt*, 250 F.3d at 892. And we have expressly followed the language in the *Ramdass* plurality opinion that a *Simmons* instruction is only required when the defendant would not be eligible for parole as a matter of law. *See Bacon*, 225 F.3d at 486.[7]

This is for good reason. Campbell's proposed extension of *Simmons* — requiring courts to determine whether a defendant would be effectively ineligible for parole — is "neither 'necessary [n]or workable.'" *Stitt*, 250 F.3d at 892 n.14 (quoting *Ramdass*, 530 U.S. at 169). Campbell's approach has no logical endpoint, and would eviscerate *Simmons*'s clear rule. It would cast trial courts into a sea of uncer-

---

[6]Justice O'Connor did suggest that "[w]here all that stands between a defendant and parole ineligibility under state law is a purely ministerial act, *Simmons* entitles the defendant to inform the jury of that ineligibility . . . even if he is not technically 'parole ineligible' at the moment of sentencing." *Ramdass*, 530 U.S. at 180. In this case, no legal technicality stands between Campbell and parole ineligibility under North Carolina law, so the "purely ministerial act" language has no application. Justice O'Connor in fact specifically noted that "*Simmons* does not require courts to estimate the likelihood of future contingencies concerning the defendant's parole ineligibility." *Id.* at 181. Asking courts to predict whether a defendant will live long enough to seek parole would run counter to this cautionary limitation.

[7]Our decision in *Richmond v. Polk*, 375 F.3d 309 (4th Cir. 2004), is not to the contrary. In *Richmond*, the state argued that a *Simmons* instruction was not necessary, because the petitioner was parole eligible under state law. *Id.* at 333. The petitioner had, however, been previously convicted on federal murder charges, and was ineligible for parole as a matter of federal law. *Id.* at 316. We rejected the state's argument, noting that defendants "have the opportunity to inform the jury of their parole ineligibility irrespective of how it came about." *Id.* at 333. Unlike the petitioner in *Richmond*, Campbell is not ineligible for parole "as a legal matter." *Bacon*, 225 F.3d at 486.

tainty as to whether a *Simmons* instruction is required in a particular case. And it would force courts to ponder countless considerations — whether, for example, the defendant's other convictions would likely result in parole at the earliest moment of eligibility, whether the defendant regularly smoked cigarettes, or whether his family had a history of heart disease. *See Ramdass*, 530 U.S. at 169 ("If the inquiry is to include whether a defendant will, at some point, be released from prison, even the age or health of a prisoner facing a long period of incarceration would seem relevant. The possibilities are many, the certainties few."). And extending *Simmons* to situations where a defendant is not parole ineligible as a matter of law holds forth only the prospect of additional uncertainty and complexity in capital sentencing proceedings. Delving into parole possibilities and reasonable life expectancies should remain the province of parole boards and actuaries, not judges.

Finally, even if we agreed with Campbell's functional approach to calculating parole ineligibility, his claim would still run aground. For one, this approach is surely not clearly established by *Simmons*, *see* 28 U.S.C. § 2254(d)(1); *see also Ramdass*, 530 U.S. at 169, and would be a new rule inapplicable on collateral review, *see Teague v. Lane*, 489 U.S. 288, 310 (1989). For another, relief is foreclosed by Campbell's failure to request a parole ineligibility instruction at trial, because *Simmons* is not contravened when "the fact that a jury was not informed of the defendant's parole ineligibility . . . was due to the defendant's own inaction." *Townes v. Murray*, 68 F.3d 840, 850 (4th Cir. 1995). This is the case even "when *the jury* requests such information" from the trial court, as occurred here. *Id.* Campbell makes much of the fact that the prosecution argued about his future dangerousness. But this alone does not require a court to give a *Simmons* instruction, as these types of arguments are often the premise on which a capital sentence is sought. *See, e.g.*, *Ramdass*, 530 U.S. at 161. The state court thus did not unreasonably apply *Simmons* in refusing to require trial courts to give a parole ineligibility instruction when a defendant would be eligible for parole as a matter of law. To breach this line would run afoul of Supreme Court and circuit precedent, and would violate the constraints that Congress in AEDPA placed upon federal habeas review.

IX.

For the foregoing reasons, the judgment of the district court dismissing Campbell's federal habeas petition is

*AFFIRMED*.

MICHAEL, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment. I also concur in the majority's analysis of James Campbell's claims, with the exception of part VII, which concerns the applicability of *Ake v. Oklahoma*, 470 U.S. 68 (1985), and part VIII, which concerns the applicability of *Simmons v. South Carolina*, 512 U.S. 154 (1994). I write separately because I respectfully disagree with the majority on two matters that do not bear on the judgment. First, *Ake* is not satisfied by the appointment of a neutral psychiatrist. Second, a *Simmons* instruction could be required in the instance when a capital defendant is technically eligible for parole but state law mandates his imprisonment beyond the time he could possibly be alive.

I.

Campbell argues that the state court unreasonably applied *Ake*, 470 U.S. 68, because Dr. Bob Rollins, the psychiatrist, (1) did not provide adequate expert assistance and (2) was a neutral expert who assisted both parties. I agree with the majority's conclusion on the first point: Campbell cannot show that Dr. Rollins provided inadequate assistance. I disagree with the majority's analysis on the second point to the extent that it suggests *Ake* might not require a court to appoint a non-neutral expert. *See ante* at 23 ("Even if *Ake* somehow required the court to appoint a non-neutral expert . . . .").

When a defendant demonstrates that his sanity is likely to be a significant factor at trial, the state must ensure the defendant access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. Like appointed counsel, an expert

appointed under *Ake* is to aid the defendant and function as a "basic tool[ ]" in his defense. *Id.* at 77. It is thus anticipated that an *Ake* expert will help the defense determine whether insanity is a viable defense and prepare the cross-examination of the state's psychiatric witnesses. *Id.* at 82. This assistance is required because it is "fundamentally unfair" for a state to proceed against an indigent defendant without ensuring access to "the raw materials integral to the building of an effective defense." *Id.* at 77. As numerous other courts have determined, access to these "raw materials" requires more than permission to subpoena a neutral expert and question him on the stand. *See Powell v. Collins*, 332 F.3d 376, 391 (6th Cir. 2003) (listing cases). The court-appointed psychiatrist must work on behalf of the defense.

Even though I believe that *Ake* requires more than the appointment of a neutral expert, I agree that *Ake* was satisfied in Campbell's case. The trial court appointed Dr. Rollins "to assist the defendant in the evaluation, preparation and presentation of the defense in this case." J.A. 54. As noted by the district court, "[o]nce [Dr. Rollins] was appointed by the court to act as the defense['s psychiatric] expert, Rollins clearly understood his duty to examine Campbell *on behalf of the defense and no other party*." J.A. 4810 (emphasis added). Campbell's *Ake* claim therefore fails.

## II.

As our court has previously confirmed, the parameters of *Simmons*, 512 U.S. 154, are governed by Justice O'Connor's "decisive" concurring opinion in *Ramdass v. Angelone*, 530 U.S. 156 (2000). *See United States v. Stitt*, 250 F.3d 878, 890 n.11 (4th Cir. 2001) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .") (internal quotation marks omitted)). In *Ramdass* Justice O'Connor held that the petitioner was not entitled to a *Simmons* instruction because he was not "[in]eligible for parole under state law at the time of his sentencing." *Id.* at 181 (O'Connor, J., concurring). Recognizing that it can be diffi-

cult to determine what constitutes parole ineligibility, Justice O'Connor articulated a practical standard:

> Where all that stands between a defendant and parole ineligibility under state law is a purely ministerial act [specifically, an act that is inevitable and foreordained under state law], *Simmons* entitles the defendant to inform the jury of that ineligibility . . . even if he is not technically "parole ineligible" at the moment of sentencing.

*Id.* at 180. Justice O'Connor went on to explain that *Simmons* "does not require courts to estimate the likelihood of future contingencies concerning the defendant's parole ineligibility." *Id.* at 181.

At first glance the *Ramdass* plurality's holding looks similar to Justice O'Connor's: it held that *Simmons* "applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Id.* at 169 (plurality opinion). The remainder of the plurality's analysis, however, calls for a narrower application of *Simmons* than does the rule and analysis set forth in Justice O'Connor's concurrence. For instance, as the majority notes, the *Ramdass* plurality rejected the suggestion that a "functional approach" to *Simmons* was appropriate. *Id.* Likewise, the *Ramdass* plurality suggested that *Simmons* cannot apply in a case where the court must inquire "whether a defendant will, at some point, be released from prison." *Id.* Justice O'Connor's concurrence, however, does not go as far. Unlike the plurality opinion, it specifically leaves open the possibility that a defendant could be entitled to a *Simmons* instruction even if he is "not technically 'parole ineligible' at the moment of sentencing." *Id.* at 180 (O'Connor, J., concurring).

Although Justice O'Connor's concurrence is controlling, the majority rests its analysis largely on the holding and reasoning of the *Ramdass* plurality. *See ante* at 25-26. Because Justice O'Connor's position represents the holding in *Ramdass*, *see Marks*, 430 U.S. at 193, her concurring opinion points us to the relevant question in this case: whether Campbell was ineligible for parole under state law at the time of his sentencing. *See id.* at 181 (O'Connor, J., concurring).

Campbell argues that he was entitled to a *Simmons* instruction because, for all practical purposes, the only alternative to a death sentence was life without parole. According to Campbell,

> If [he] had received a life sentence for the murder along with the two mandatory life sentences for the rapes, he would not have become eligible for parole until after he served an absolute minimum of sixty years [twenty years for each crime.] At that point, he would have been ninety-two years old. Only then could he begin serving the eighty years for the robbery, kidnapping, and burning offenses.

Appellant's Br. at 18. The problem with Campbell's argument is that he has not cited any provision in North Carolina law that conclusively establishes his parole ineligibility. For instance, although we are told that North Carolina judges follow the practice of ordering consecutive sentences in cases like Campbell's, *id.* at 19, concurrent sentences were apparently authorized under state law at the time of Campbell's sentencing. Therefore, it was not foreordained or inevitable (incapable of being prevented) that Campbell would die before becoming eligible for parole, if he was not sentenced to death. For this reason, I agree that he was not entitled to a *Simmons* instruction.

This is not to say, however, that a *Simmons* instruction is required only in instances where the only available alternative sentence to death is a formal sentence of life imprisonment that carries no possibility of parole as a matter of law. In other words, there might be instances when a defendant's age and length of sentence will determine that he is entitled to a *Simmons* instruction. As I have said previously, *Simmons* might compel a sentencing court to allow a capital defendant to inform the jury of the true effect of an alternate life sentence. *See Wilson v. Greene*, 155 F.3d 396, 417 (4th Cir. 1998) (Michael, J., concurring). Suppose that Campbell had been convicted of murder and four (instead of two) other crimes carrying mandatory life sentences. If consecutive sentences for the five crimes were mandatory, Campbell (who was thirty-two at sentencing) could not have been paroled until he reached 132 years of age. Under these circumstances, it would be fair to conclude that he is "[in]eligible for parole under state law at the time of his sentencing." *Ramdass*, 530 U.S. at 181 (O'Connor, J., concurring). Such a conclusion requires no estima-

tion of "the likelihood of future contingencies" because humans simply do not live that long. As Justice O'Connor said in *Ramdass*, "Where all that stands between a defendant and parole ineligibility under state law is a purely ministerial act [that is, one that is inevitable and foreordained under state law]," he is entitled to a *Simmons* instruction, "even if he is not technically 'parole ineligible' at the moment of sentencing." 530 U.S. at 180. That a defendant will die before he reaches 132 years of age is, by today's standards, "inevitable and foreordained."

Justice O'Connor's use of the term "ministerial act" in her *Ramdass* concurrence is broad enough to cover my hypothetical. Her use of the words "inevitable" and "foreordained" to clarify the meaning of "purely ministerial act" shows that her rule contemplates a range of inevitable occurrences, beyond those commonly thought of as ministerial. Justice O'Connor apparently used the word "ministerial" because it was used by the petitioner to characterize the specific contingency at issue in *Ramdass*, the entry of a judgment against him as a result of a jury verdict finding him guilty of a crime. *Id.* at 174 (plurality opinion) (citing petitioner's brief). "Ministerial" is defined broadly as "[o]f or relating to an act that involves obedience to instructions or laws instead of discretion, judgment, or skill." *Black's Law Dictionary* 1017 (8th ed. 2004). Under this definition a judge's imposition of mandatory consecutive sentences and a custodian's automatic, seriatim execution of those sentences are ministerial acts, especially insofar as they involve no exercise of discretion and are foreordained under state law.

I agree that determining whether a defendant would be effectively parole ineligible could sometimes require extra effort. The majority's contention that this prospect would "cast trial courts into a sea of uncertainty," *ante* at 26-27, exaggerates the problem, however. A case such as the hypothetical I describe above casts no court or party into a sea of uncertainty because there is no genuine question whether a defendant could live to 132. Furthermore, it is critical to keep in mind that the Supreme Court articulated the *Simmons* rule not because it is a rule that is easily administered, but because due process requires it. *See Simmons*, 512 U.S. at 175 (O'Connor, J., concurring) (explaining that due process requires that a defendant not be sentenced to death based on information that he had no opportunity to explain or deny).

It is not unreasonable to expect a court to confront and resolve a difficult factual issue when doing so is necessary to protect a constitutional right. Furthermore, Justice O'Connor has given courts a workable standard to apply in determining when a defendant is parole ineligible under state law: when all that stands between a defendant and parole ineligibility is a ministerial act that is inevitable and foreordained under state law, the defendant is entitled to a *Simmons* instruction even if he is not technically parole ineligible at the moment of sentencing. This is the standard that controls today.